10:1

Petition Under 28 USC § 2254 for Writ of
Habeas Corpus by Person in State Custody

| United States District Court | Central District | |
|---|---|---|
| name: Robert A. Warren | Prisoner No: B50436 | Case No: 95CF1275 |
| Place of Confinement: Pontiac Correctional Center | | 04-1350 |

name of Petition **RECEIVED**

Robert A. Warren, OCT 0 8 2004
Pro-se
JOHN M. WATERS, CLERK
U.S. DISTRICT COURT
**CENTRAL DISTRICT OF ILLINOIS**

v.

name of Respondents:

Stephen D. Mote, Warden,
Pontiac Correctional Center,
and the State and People of
Illinois.

Attorney General of Illinois: Hon. Lisa Madigan

## Petition

1. Name and Location of Court Which entered the Judgement of Conviction under Attack:
   16th Judicial Circuit, Kane County, St. Charles

2. Date of Judgement of Conviction:
   August 28, 1998

3. Length of Sentence:
   Fifty-two (52) years, Illinois Dept. of Corrections.

4. Nature of Offense involved:
   First Degree Murder – ILCS 720 5/9-1 (a)

5. What was your Plea:
   Not guilty

6. If you Pleaded not guilty, what kind of trial did you have?:
   Jury

7. Did you testify at trial?:
   yes

8. Did you Appeal from the Judgement of Conviction?:
   yes

9. If you did Appeal, Answer the following

(a) Name of Court:
   Second Judicial District, Elgin, Ill.

# United States District Court
## Central District of Illinois

| | |
|---|---|
| Robert A. Warren, Pro-se<br>Petitioner<br><br><br>V.<br><br><br>Stephen D. Mote, Warden,<br>Pontiac Correctional Center,<br>and the State and People of Illinois.<br>Respondents | Application to Proceed in<br>Forma Pauperis, Supporting<br>Documentation and Order<br><br>Case no. __04-1350__<br><br>**FILED**<br><br>OCT 08 2004<br><br>JOHN M. WATERS, Clerk<br>U.S. DISTRICT COURT<br>CENTRAL DISTRICT OF ILLINOIS |

I, Robert A. Warren, declare that I am the Petitioner in the above-entitled Proceeding; that, in support of my request to proceed without being required to prepay fees, cost or give security therefor, I state that because of my poverty I am unable to pay the costs of said Proceeding or give security therefor; that I believe I am entitled to relief, the nature of my action. defense. or other Proceeding or the issues I entend to present on appeal are briefly as follows:

1. I am not presently employed.

2. I have not been employed in over two (2) years.

3. I do not own any cash or have any savings or checking accounts or any cash on or in any prison accounts.

4. I do not own or have any interest in any real estate, stocks, bonds, notes, or automobiles, or any other valuable property.

5. I do not have any dependent persons.

6. Attached to this Application is a (6) six month Commissary Ledger which shows Average balance.

Subscribed to and before me
this __6__ day of __October__, 2004, A.D.

_Sharon R. Eden_
Notary Public

_Robert Warren_
Petitioner

"OFFICIAL SEAL"
Sharon R. Eden
Notary Public, State of Illinois
My Commission Exp. 11/13/2005

Date: 7/26/2004
Time: 9:40am
d_list_inmate_trans_statement_composite

T:04-07-01350-MMM    # 1    Page 3 of 113

Page 1

**Pontiac Correctional Center**
**Inmate Trust Fund**
Inmate Transaction Statement

REPORT CRITERIA - Date: 04/26/2004 thru End;    Inmate: B50436;    Active Status Only ? : No;    Print
Restrictions ? : Yes;    Transaction Type: All Transac    Types;    Print Furloughs / Restitutions ? : Yes;    Include
Inmate Totals ? : Ye    t Balance Errors Only ? : No

**Inmate: B50436 Warren, Robert**                     ousing i     PON-N -06-48

| Date | Source | Transaction Type | Batch | Reference # | Description | Amount | Balance |
|------|--------|------------------|-------|-------------|-------------|--------|---------|
| | | | | | **Beginning Balance:** | | **0.20** |
| 06/04/04 | Mail Room | 01 MO/Checks (Not Held) | 156259 | 7978495292 | Warren, Elizabeth | 20.00 | 20.20 |
| 06/07/04 | Disbursements | 81 Legal Postage | 159360 | Chk #50731 | 338254 - DOC: Postage | -.37 | 19.83 |
| 06/07/04 | Disbursements | 81 Legal Postage | 159360 | Chk #50731 | 341927 - DOC: Postage | -.37 | 19.46 |
| 06/07/04 | Disbursements | 81 Legal Postage | 159360 | Chk #50731 | 337682 - DOC: Postage | -.37 | 19.09 |
| 06/07/04 | Disbursements | 81 Legal Postage | 159360 | Chk #50731 | 338121 - DOC: Postage | -.60 | 18.49 |
| 06/07/04 | Disbursements | 81 Legal Postage | 159360 | Chk #50731 | 344514 - DOC: Postage | -.37 | 18.12 |
| 06/07/04 | Disbursements | 81 Legal Postage | 159360 | Chk #50731 | 337070 - DOC: Postage | -.37 | 17.75 |
| 06/07/04 | Disbursements | 81 Legal Postage | 159360 | Chk #50731 | 342969 - DOC: Postage | -.37 | 17.38 |
| 06/07/04 | Disbursements | 81 Legal Postage | 159360 | Chk #50731 | 337347 - DOC: Postage | -.37 | 17.01 |
| 06/07/04 | Disbursements | 81 Legal Postage | 159360 | Chk #50731 | 347641 - DOC: Postage | -.83 | 16.18 |
| 06/07/04 | Disbursements | 81 Legal Postage | 159360 | Chk #50731 | 347628 - DOC: Postage | -.60 | 15.58 |
| 06/07/04 | Disbursements | 81 Legal Postage | 159360 | Chk #50731 | 351565 - DOC: Postage | -.37 | 15.21 |
| 06/07/04 | Disbursements | 82 ID Cards, Keys, Locks | 159360 | Chk #50733 | 353135 - DOC: Keys/Ids/Locks | -5.00 | 10.21 |
| 06/07/04 | Disbursements | 90 Medical Co-Pay | 159360 | Chk #50741 | 345915 - DOC: Medical Co-Pay | -2.00 | 8.21 |
| 06/07/04 | Disbursements | 90 Medical Co-Pay | 159360 | Chk #50741 | 341369 - DOC: Medical Co-Pay | -2.00 | 6.21 |
| 06/07/04 | Disbursements | 90 Medical Co-Pay | 159360 | Chk #50741 | 339220 - DOC: Medical Co-Pay | -2.00 | 4.21 |
| 06/07/04 | Disbursements | 90 Medical Co-Pay | 159360 | Chk #50741 | 356726 - DOC: Medical Co-Pay | -2.00 | 2.21 |
| 06/07/04 | Disbursements | 90 Medical Co-Pay | 159360 | Chk #50741 | 335966 - DOC: Medical Co-Pay | -2.00 | .21 |

| | |
|---|---|
| **Total Inmate Funds:** | .21 |
| **Less Funds Held For Orders:** | .00 |
| **Less Funds Restricted:** | 16.53 |
| **Funds Available:** | -16.32 |
| **Total Furloughs:** | .00 |
| **Total Voluntary Restitutions:** | 271.12 |

**RESTITUTIONS**

| Rest. # | Vendor | | Transaction | Tran. Date | Amount | Balance |
|---------|--------|---|-------------|------------|--------|---------|
| 5334 | 5 | DOC: Restitutions | Beginning Balance | 11/13/2002 | 276.12 | 271.12 |
| | | | | **Total:** | | 271.12 |

**RESTRICTIONS**

| Invoice Date | Invoice Number | Type | Description | Vendor | | Amount |
|--------------|----------------|------|-------------|--------|---|--------|
| 02/05/2004 | 357683 | Disb | B50436 Medical Co-Pay | 58 | DOC: Medical Co- | $2.00 |
| 02/05/2004 | 357699 | Disb | B50436 Legal Postage | 3 | DOC: Postage | $0.37 |
| 02/18/2004 | 359893 | Disb | B50436 Legal Postage | 3 | DOC: Postage | $0.60 |
| 02/18/2004 | 359894 | Disb | B50436 Legal Postage | 3 | DOC: Postage | $0.37 |
| 02/25/2004 | 361049 | Disb | B50436 Medical Co-Pay | 58 | DOC: Medical Co- | $2.00 |

# Pontiac Correctional Center
## Inmate Trust Fund
### Inmate Transaction Statement

REPORT CRITERIA - Date: 04/26/2004 thru End;   Inmate: B50436;   Active Status Only ? : No;   Print
Restrictions ? : Yes;   Transaction Type: All Transaction Types;   Print Furloughs / Restitutions ? : Yes;   Include
Inmate Totals ? : Yes;   Print Balance Errors Only ? : No

**Inmate: B50436  Warren, Robert**                 **Housing Unit: PON-N -06-48**

**RESTRICTIONS**

| Invoice Date | Invoice Number | Type | Description | Vendor | | Amount |
|---|---|---|---|---|---|---|
| 03/04/2004 | 362242 | Disb | B50436 Medical Co-Pay | 58 | DOC: Medical Co- | $2.00 |
| 03/16/2004 | 364280 | Disb | B50436 Medical Co-Pay | 58 | DOC: Medical Co- | $2.00 |
| 03/18/2004 | 364616 | Disb | B50436 Legal Postage | 3 | DOC: Postage | $2.21 |
| 03/22/2004 | 364922 | Disb | B50436 Legal Postage | 3 | DOC: Postage | $0.37 |
| 06/02/2004 | 376259 | Disb | B50436 Legal Postage | 3 | DOC: Postage | $0.23 |
| 06/14/2004 | 377723 | Disb | B50436 Legal Postage | 3 | DOC: Postage | $0.37 |
| 06/15/2004 | 378037 | Disb | B50436 Legal Postage | 3 | DOC: Postage | $1.98 |
| 06/17/2004 | 378378 | Disb | B50436 Legal Postage | 3 | DOC: Postage | $0.37 |
| 06/28/2004 | 379721 | Disb | B50436 Legal Postage | 3 | DOC: Postage | $0.37 |
| 07/06/2004 | 380750 | Disb | B50436 Legal Postage | 3 | DOC: Postage | $1.29 |
| | | | | **Total Restrictions:** | | $16.53 |

United States District Court
Central District of Illinois

Robert A. Warren,
        Petitioner,


        v.                              Case no.  04-1350


Stephen D. Mote, Warden,
Pontiac Correctional Center,
and the People and State of Illinois.
        Respondents

## Order of Court

the Application is hereby denied.          the Application is hereby
                                           granted. Let the Applicant
                                           Proceed without payment
                                           of cost or fees or the
                                           Necessity of giving security
                                            therefor.



_____                     _____
    Justice                                     Justice
    _____                              _____
        date                                        date

10:!

Petition Under 28 USC § 2254 for Writ of
Habeas Corpus by Person in State Custody

| United States District Court | | Central District |
|---|---|---|
| name: Robert A. Warren | Prisoner No: B50436 | Case No: 95CF1275 |

Place of Confinement: Pontiac Correctional Center    04-1350

name of Petition **RECEIVED**         name of Respondents:

Robert A. Warren, OCT 0 8 2004          Stephen D. Mote, Warden,
Pro-Se                     Pontiac Correctional Center,
    JOHN M. WATERS, CLERK    V.         and the State and People of
    U.S. DISTRICT COURT                Illinois.
    CENTRAL DISTRICT OF ILLINOIS

Attorney General of Illinois: Hon. Lisa Madigan

## Petition

1. Name and Location of Court which entered the Judgement of Conviction under Attack:
   16th Judicial Circuit, Kane County, St. Charles

2. Date of Judgement of Conviction:
   August 28, 1998

3. Length of Sentence:
   Fifty-two (52) years, Illinois Dept. of Corrections.

4. Nature of Offense involved:
   First Degree Murder - ILCS 720 5/9-1(a)

5. What was your Plea:
   not guilty

6. If you Pleaded not guilty, what kind of trial did you have?:
   Jury

7. Did you testify at trial?:
   yes

8. Did you Appeal from the Judgement of Conviction?:
   yes

9. If you did Appeal, Answer the following

(a) Name of Court:
   Second Judicial District, Elgin, Ill.

(b) Result:

Affirmed Conviction

(c) Date of Result and Citation, if Know:

July 20, 2000 , Rule 23 order

(d) Grounds raised:

1. Whether the defendant was proven guilty of First degree murder beyond reasonable doubt;

2. Whether the trial court erroneously allowed impeachment of the defendant with his prior conviction;

3. Whether the defendant's statements and evidence seized by the police were the product of an unreasonable search and seizure;

4. Whether the defendant's Conviction should be reversed because the Jury's Verdict was based on inadmissable evidence;

5. Whether the defendant knowingly and intelligently waived his rights to silence and Counsel.

(e) If you sought further review of the decision on Appeal by a higher State Court, Please Answer the following:

(1) Name of Court:

Illinois Supreme Court on a Petition for Leave to Appeal filed Sept.6,2000

(2) Result:

Pending

10. Other then a direct Appeal from the Judgement of Conviction and sentence, have you Previously Filed any Petitions, Applications, or Motions with respect to this Judgement in any Court State or Fedreal?:

yes

11. If your answer to 10 was "yes," give the following Information:

(a) (1) Name of Court:

16 Judicial Circuit

(2) Nature of Proceeding:

Post-Conviction under newly discoverd evidence

(3) Grounds Raised:

that the State knowingly used false testimony to obtain defendent's Conviction Defendent was Convicted unlawfully - Judgement Not with standing Jury's verdict

-2-

(4) Did you recieve an evidentiary hearing on your petition, application or motion?
NO

(5) Result:
Still Active

(6) Date of Result:
not concluded yet

(b) as to any Second petition, application or motion give the same information:

(1) name of Court:
Illinois Supreme Court

(2) nature of proceeding:
motion to expedite decision, reconsideration

(3) Grounds raised:
excessive delay - due process denial

(4) Did you recieve an evidentiary hearing on your petition, application or motion?:
yes

(5) Result:
motion denied

(6) Date of result:
Sept. 10, 2004

(C) Did you Appeal to the highest State court having Juristdication the result of action taken on any petition, application or motion?

(1) first Petition ect.   NO
(2) Second Petition ect.   yes

(12)

(a) Ground one: excessive delay in appeal - due process denial, Illegal Custody.
   Supporting facts:

Petitioner has filed motions to the Illinois Supreme court - Motions to expedite decision, on his Petition for Leave to appeal, because of the (4) Four year plus delay, and has steady proclaimed his Innocenet without any Justification from the Supreme Court for its delay, except, to have his motions denied. Petitioner's Petition (P.L.A.) was timely filed in the Illinois Supreme Court on September 06, 2000., the contents in the Petitioner's P.L.A shows reasonable doubt that the Petitioner is not the Offender or is Guilty as Charged.

-3-

Petitioner Strongly belives that this is the reason for the delay which is not fair to be held at Liberty, when Justice can prevail with the fundemental fairness., PreJudice towards the petitioner is dening due process. and the custody is not Legal, because of the excessive delay. (see Appendix, A-B&C,D attached)

(b) Ground two: <u>The Petitioner was not proven guilty of first degree murder beyond a reasonable doubt.</u>

Supporting facts:

Because the State's case consisted of a single fingerprint and other Circumstances evidence and because the state contended that the victim was first hit on the back of the head with his own cane, then chocked and stabbed, and finally drowned and where the petitioner reported the crime and fully cooperated with the police, the state failed to prove the petitioner guilty of murder beyond a reasonable doubt. (See EX. D)

(c) Ground three: <u>the trial court erroneously allowed impeachment of the Petitioner with his conviction Prior.</u>

Supporting facts:

the trial court erred by permiting the admission of evidence of the petitioner's Prior Criminal conviction as impeachment, and pursuant to People v. thomas, and People v. Atkinson, by restricting the impeachment to the mere-fact method. (See EX. D)

(d) Ground Four: <u>the petitioner's statement and evidence seized by the police were the product of an unreasonable search and seizure.</u>

Supporting facts:

Where the police, without a warrant or probable cause, brought the petitioner to the police station before midnight and took all of His Clothes, his boots, and a sample of blood, and held him until at least 6:00 am. while investigating his background and account of the night's event's, the pretrial motion to Quash his arrest should have been granted because this is exactly the kind of coercive police practice from which Suspects must be protected. (See EX. D)

(e) Ground Five: <u>the petitioner's conviction should be reversed because the jury's verdict was based on inadmissable evidence.</u>

Supporting facts:

Justice requires that petitioner's conviction be reversed because the Jury's verdict was based on inadmissable evidence -- evidence that was obtained illegally when the police held the petitioner long after he gave his account of the occurrence he witnessed..... (See Ex. D)

(f) Ground six: <u>the petitioner did not knowingly and intelligently waive his rights to silence and Counsel.</u>

<u>Supporting facts:</u>

the trial court's denial of the petitioner's motion to suppress his statements was manifestly erroneous where its decision was based on (1) his asking for a lawyer after he cooperated with the police and relinquished his clothing, blood, and statements, (2) the petitioner's courtroom demeanor, and (3) the opinion of a psychiatrist whose field of expertise did not encompass the issue to be decided, namely, the petitioner's ability to understand Miranda warnings at the time of the interrogation. (See Ex. D)

(13) ALL grounds listed in 12 A, B, C, D, E And f have all been presented to the highest state court. which now, 12 B, C, D, E, and f are pending in the ILL. supreme court, on a Petition for leave to appeal.

(14) Do you have any petition or appeal now pending in any court either state or federal, as to the Judgement under attack?:

<u>Yes</u>

(15) Give the name and address, if know, of each attorney who represented you in the following stages of the Judgement attacked herein:

(a) at Preliminary hearing: <u>Public defender, Tom Brosnon, Kane Co.</u>

(b) at Arraigment and plea: <u>Public defender, Tom Brosnon, Kane co.</u>

(C) at trial: <u>Public defender, Don Lorek, kane co.</u>

(D) at sentencing: <u>Public defender, Don Lorek, Joe Cercelli, Kane co.</u>

(e) on Appeal: <u>Appellate defender, Linda A. Johnson, Kane co.</u>

(f)  in any post-Conviction Proceeding:

Just appointed, unknown at this time

(g)  on appeal from any adverse ruling in a post-Conviction Proceeding:

Post-Conviction has not reached this stage yet.

(16)  Were you sentenced on more then one account of an indictment, or on more then one indictment, in the same court at the same time ?:

no

(17)  Do you have any future sentence to serve after you complete the sentence imposed by the Judgement under attack?:

no

Wherefore, Petitioner prays that the court grant Petitioner relief to which he may be entitled in this Proceeding.

Robert W. Warren
Robert A. Warren
Petitioner

Subscribed and Sworn to before me this ___6___ day of October, 2004, A.D.

Sharon R. Eden
Notary Public

"OFFICIAL SEAL"
Sharon R. Eden
Notary Public, State of Illinois
My Commission Exp. 11/13/2005

# Appendix
## List of Exhibits

A. Letter From Illinois Supreme Court Clerk dated on September 6th, 2000, advising that P.L.A has been Filed; and permitted to proceed as a poor person.

B. Letter From Illinois Supreme Court Clerk dated on June 7, 2004, advising that P.L.A. is Still pending and saids P.L.A. was filed on September 6, 2000;

C. Letter From Illinois Supreme Court Clerk dated on September 10, 2004, advising the order of denial on Petitioner's motion to expedite the Petition For Leave to appeal.

D. Petition for Leave to appeal filed Sept. 6, 2000.

E. Post Conviction Filed in Circuit Court Oct. 3, 2000.

F. Amended Post-Conviction Filed in Circuit Court.



## SUPREME COURT OF ILLINOIS

SUPREME COURT BUILDING

**JULEANN HORNYAK**
CLERK OF THE COURT
(217) 782-2035

TELECOMMUNICATIONS DEVICE
FOR THE DEAF
(217) 524-8132

SPRINGFIELD 62701

September 6, 2000

**FIRST DISTRICT OFFICE**
20TH FLOOR
160 NO. LASALLE ST.
CHICAGO 60601
(312) 793-1332

TELECOMMUNICATIONS DEVICE
FOR THE DEAF
(312) 793-1333

Mr. Robert A. Warren
Reg. No. B-50436
P. O. Box 711
Menard, IL 62259-0711

Re: No. 90171 - People State of Illinois, respondent, v. Robert A. Warren, petitioner.

Dear Mr. Warren:

This office has today filed your petition for leave to appeal in the above-entitled cause. You are being permitted to proceed as a poor person.

Your petition will be presented to the Court for its consideration, and you will be advised of the Court's action thereon.

Very truly yours,

*Juleann Hornyak*

Clerk of the Supreme Court

JH/jat
cc: AG CrRyan
    SA Kane
    SAAP Elgin

"EX. A"



SUPREME COURT OF ILLINOIS
SUPREME COURT BUILDING
SPRINGFIELD 62701

**JULEANN HORNYAK**
CLERK OF THE COURT
(217) 782-2035

TELECOMMUNICATIONS DEVICE
FOR THE DEAF
(217) 524-8132

June 7, 2004

**FIRST DISTRICT OFFICE**
20TH FLOOR
160 N. LASALLE ST.
CHICAGO 60601
(312) 793-1332

TELECOMMUNICATIONS DEVICE
FOR THE DEAF
(312) 793-6185

Mr. Robert A. Warren
Reg. No. B-50436
P. O. Box 99
Pontiac, Illinois 61764

     Re:   No. 90171 - People State of Illinois, respondent, v. Robert A. Warren, petitioner.

Dear Mr. Warren:

This will acknowledge receipt of your letter regarding the status of the above-entitled cause on June 7, 2004.

As you know, your petition for leave to appeal, filed September 6, 2000, is still pending in this Court, and you will be advised by mail the same day the Court announces a decision on your petition. The Court will make its next announcement of decisions for pending petitions for leave to appeal sometime in late September or early October.

Please be assured that several other petitions for leave to appeal are currently pending along with yours, however, none of them have been forgotten by the Court.

               Very truly yours,

               *Juleann Hornyak*

               Clerk of the Supreme Court

JH/jak

"EX. B"



# Supreme Court of Illinois
SUPREME COURT BUILDING
SPRINGFIELD 62701

**JULEANN HORNYAK**
CLERK OF THE COURT
(217) 782-2035

TELECOMMUNICATIONS DEVICE
FOR THE DEAF
(217) 524-8132

September 10, 2004

**FIRST DISTRICT OFFICE**
20TH FLOOR
160 NO. LASALLE ST.
CHICAGO 60601
(312) 793-1332

TELECOMMUNICATIONS DEVICE
FOR THE DEAF
(312) 793-1333

Mr. Robert A. Warren
Reg. No. B-50436
P. O. Box 99
Pontiac, IL 61764

> In re: People State of Illinois, respondent, v. Robert A.
> Warren, petitioner.
> No. 90171

Today the following order was entered in the captioned case:

> Motion by petitioner, pro se, to reconsider this Court's order
> of January 7, 2004, denying the motion to expedite
> consideration of the petition for leave to appeal. Motion
> Denied.

> Order entered by the Court.

Very truly yours,

*Juleann Hornyak*

Clerk of the Supreme Court

cc: Hon. Lisa Madigan
State's Attorney Kane County
State's Attorneys App. Pros. Elgin
Ms. Linda A. Johnson

"EX. C"

# 90171

No._____

---

IN THE

SUPREME COURT OF ILLINOIS

---

PEOPLE ~~OF THE~~ STATE OF ILLINOIS

~~Plaintiff~~ Respondent,


Vs.


ROBERT A. WARREN

~~Defendant~~ Petitioner,

---

Petition for leave to Appeal from the Appellate Court
of Illinois, second district.  General No. 2-98-1510

There heard on Appeal from the Circuit Court of the 16th
Judicial Circuit, Kane County, Illinois.  Criminal Division.
No. 95-CF-~~▓▓▓~~ ~~▓▓▓▓~~ 1275
The Honorable Donald C. Hudson,  Judge Presiding.

---

**PETITION FOR LEAVE TO APPEAL**

**FILED**

SEP 6 - 2000

SUPREME COURT CLER

Robert A. Warren
Reg: # B50456
Menard Correctional Center
P.O. Box 711
Menard, Illinois. 62259-071

Defendant-Appellant- Pro-se

35-091/00 .
R-072000
RH denied 080700

"EX. D"

No._____

---

## IN THE SUPREME COURT OF
## THE STATE OF ILLINOIS.

---

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS) | **PETITION FOR LEAVE TO APPEAL** |
| Plaintiff-Appellee,  ) | **FROM THE APPELLATE COURT OF** |
| ) | **ILLINOIS. SECOND DISTRICT.** |
| VS.  ) | **KANE COUNTY, ILLINOIS.** |
| ) | **No. 2-98-1510** |
| ROBERT A. WARREN,  ) | |
| Defendant-Appellant, pro-se  ) | **THERE HEARD ON APPEAL FROM THE** |
| ) | **CIRCUIT COURT FOR THE 16th** |
| ) | **JUDICIAL CIRCUIT, KANE COUNTY,** |
| ) | **ILLINOIS.  No. 95-CF-▓▓▓ 1275** |
| ) | **HONORABLE JUDGE. DONALD C.HUDSON** |
| ) | **PRESIDING** |

---

### PETITION FOR LEAVE TO APPEAL

TO THE HONORABLE JUSTICE OF THE SUPREME COURT OF THE STATE
OF ILLINOIS.

May it please the Court:

### I.

### PRAYER FOR LEAVE TO APPEAL

Your Petitioner, ROBERT A. WARREN, (Pro-se), respectfully
petitions this Honorable Court for Leave to Appeal pursuant to
Supreme Court Rule 315, from judgement of the Appellate Court of
Illinois second district, which affirmed the judgement of conviction
entered by the Circuit Court of Kane County, Illinois upon the
jury finding petitioner guilty of First Degree Murder.

### II
### OPINION AND PROCEEDINGS BELOW.

On August 28th,1998, petitioner was found guilty of First
Degree Murder. Petitioner was subsequently sentenced to a term

(2)

## II

of fifty two (52) years in the Illinois Department of Corrections opon his conviction.  He appealed this conviction to the Illinois Appellate Court Second District.  On July 20th,2000, the Court delivered it's opinion in said appeal, affirming the judgement of said conviction and sentence.  A petition for re-hearing was filed on July,27th,2000, and said petition was DENIED.

Notice of intent to file to the Illinois Supreme Court was filed on August 8th,2000 and was GRANTED.

# III
## POINTS AND AUTHORITIES

Page

I.    Because the State's case consisted of a single fingerprint and other circumstantial evidence and because the State contended that the victim was first hit on the back of the head with his own cane, then choked and stabbed, and finally drowned, and where the defendant reported the crime and fully cooperated with the police, the State failed to prove Robert Warren guilty of murder beyond a reasonable doubt. .................................. 22

1. People V. Brown, 169 Ill.2d 132,661 N.E. 2d 287 (1996)...... 23

2. People V. Hodogbey, 306 Ill.App.3d 55,714 N.E.2d 1073 ( 1st. Dist. 1999)................................. 24

3. People V. Irby, 237 Ill. App.3d 38,602 N.E.2d 1349 )2d Dist. (1992)........................................ 26

4. People V.Zizzo, 301 Ill. App.3d 481, 703 N.E.2d 1349 (2d Dist. 1998)..................................... 26

5. People V. Scott, 148 Ill.2d 479, 542, 594 N.E.2d 217 (1992)....23

6. People V. Gomez, 215 Ill.App.3d 208,574 N.E.2d 822 (2d Dist. 1991) ...................................... 24

7. People V. Campbell, 146 Ill.2d 363,586 N.E.2d 1261 (1992)..... 24

8. People V. Williams, 65 Ill.2d 258,357 N.E 2d 525 (1976)...... 26

9. People V. Robinson, 14 Ill.2d 325, 153 N.E. 2d 65 (1958)..... 24

II.    The Appellate Court erred in their ruling by permitting the admission of evidence of the defendant's prior criminal conviction as impeachment,and, pursuant to People v. Atkinson, and People v. Thomas, by improperly restricting said impeach--ment to the mere-fact method. ..............................31

10. People V. Atkinson, 186 Ill.2d 450, 713 N.E.2d 532 (1999)..... 31

11. People V. Thomas, 220 Ill.App.3d 110, 580 N.E.2d 1353 (2d Dist. 1991).................................... 31

SD428₃MCC#1

12 People V. Montgomery, (47) Ill.2d 510,268 N.E 2d 695 (1971).... 31

13 People V. Williams (161) Ill.2d 1, 641 N.E.2d 296 (1994)...... 31

14 People V. Williams, (173) Ill.2d 48, 670 N.E.2d 638 (1996)..... 32

15 People V. McKibbins, (96) Ill.2d 176, 449 N.E.2d 821 (1983).... 34

16 People V. Scott, (278) Ill.App.3d 468, 663 N.E.2d 97 (4th Dist)
(1996)........................................... 36

17 Illinois Supteme Court Rule 615(a)........................... 37

18 People V. Medreno, (99) Ill. App.3d 449, 425 N.E. 2d 988
( 3d Dist. 1981).................................. 32

III.    Where the police, without a warrant or probable cause,
brought Robert Warren to the police station before midnight and
took all of his clothes, his boots, and a blood sample, and held
him until at least 6:00 a,m., while investigating his back-
-ground and account of the night's events, the pertrial motion
to quash his arrest should have been granted because this is
exactly the kind of coercive police practice from which suspects
must be protected. ...........................................38

U.S Const. Amend. IV......................................... 38

20 Ill. Const. 1970, Art 1 § 6............................... 38

21 People V. Holveck, (141) Ill.2d 84, 565 N.E.2d 919 (1990)...... 4

22 People V. Graham, (214) Ill.3d 798, 573 N.E.2d 1346 (1st Dist)
(1991)................................

23 People V. Bell, (96) Ill. App.3d 857, 421 N.E.2d 1351
(1st Dist. 1981) ................................

24 Miranda V. Arizona, (384) U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d
694 (1966) ................................

25 Brown V. Illinois, (422) U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d
416 (1975)................................

26 United States ex rel. Dockley V. Myers, (450) F.2d 232 (3d Cir
(1971) ................................

27 United States V. Edmons, (432) F.2d 577 (2d Cir.1970)........

28  People V. McKinney, 277 Ill.App.3d 889, 661 N.E.2d 408
       (1st Dist. 1996) ................................. 51

29  United States V. Mendenhall, 446 U.S. 544, 100 S. Ct. 1870
       64 L.Ed.2d 497 (1980) .......................... 38

30  People V. Galvin, 127 Ill.2d 153, 535 N.E. 2d 837 (1989)..... 39

31  People V. Casazza, 144 Ill.2d 414, 417, 481 N.E.2d 651 (1991).48

32  People V. Walls 220 Ill.App.3d 564, 581 N.E. 2d 264 (1st Dist)
       (1991) ......................................... 39-4

33  Terry V. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889
       (1968) ......................................... 43

34  People V. Gordon, 198 Ill.App.3d 791, 556 N.E.2d 573
       (1st Dist. 1990) ............................... 45

35  People V. Young, 206 Ill. App.3d 789, 564 N.E.2d 1254
       (1st Dist. 1990) ............................... 39

36  People V. Safunwa, 299 Ill. App.3d 707, 701 N.E. 2d 1202
       (2d Dist. 1998) ................................ 43

37  725 ILCS 5/107-2 (1995) ........................... 39

38  In re Rutland fire protection District---Ill.App.3d----, 714
       N.E.2d 592, 239 Ill.Dec.673 (2d Dist. 1999) ..........39

39  People V. Wood, 241 Ill.App.3d 285, 608 N.E.2d 1291
       (2d Dist. 1993) ................................ 54

40  People V. Stofer, 180 Ill.App.3d 158, 435 N.E.2d 1287
       (1st Dist. 1989) ............................... 46

41  People V.Longoria, 177 Ill. App.3d 241, 452 N.E.2d 1350
       ( 2d Dist.1983) ................................ 46

42  People V. Barley, 273 Ill. App.3d 943, 654 N.E.2d 223,
       (1st. Dist. 1995) ............................. 49

IV.    Justice requires that the defendants conviction be
reversed because the jury's verdict was based on inadmissible
evidence---evidence that was obtained illegally when police
held the defendant long after he gave his account of the
occurrence he witnessed. ....................................... 55

43  People V. Young, 206 Ill. App.3d 789, 564 N.E.2d 1254
       (1st. Dist. 1990) ............................. 55

44  People V. Holveck, 141 Ill.2d 84, 665 N.E.2d 919 (1990) ...... 56

45 People V. Young, 128 Ill.2d 1, 48, 538 N.E.2d 453 (1989)..... 57

V.    The Appellate Court errored in allowing the Trial Court denial of Robert Warren's Motion to suppress his statement was manifestly erroneous where its decision was based on (1) his asking for a lawyer after he cooperated with police and relinquished his clothes, blood and statement, (2) the defendant's courtroom demeanor, and (3) the opinion of a Psychiatrist whose field of expertise did not encompass the issue to be decided, namely, the defendant's ability to understand Miranda warnings at the time of the interrogation............................ 58

46 People V. Bernasco, 138 Ill.2d 349, 562 N.E.2d 958 (1995).... 68

47 In re W.C., 167 Ill.2d 307, 657, N.E.2d 908 (1995) ......... 68

48 Brown V. Illinois, 422 U.S. 590, 95 S. Ct. 2254, 45 L.Ed.2d 416 (1975) ................................. 64

49 People V. Novak, 163 Ill.2d 93, 643 N.E.2d 762 (1994) ....... 60

50 People V. Enis, 139 Ill.2d 264, 564 N.E.2d 1155 (1990) ...... 60

51 People V.Chidress, 158 Ill.2d 275, 633 N.E.2d 635 (1994)..... 60

52 People V. Brown, 169 Ill.2d 132, 661 N.E.2d 287 (1996)....... 64

53 People V. Simpkins 297 Ill. App.3d 668, 697 N.E.2d 302 (1st Dist. 1998) ............................ 61

54 Wade V. City of Chicago Heights, 295 Ill. App.3d 873, 693 N.E.2d 426 (1st Dist. 1998) ................ 61

55 People V. Sneed, 274 Ill.App.3d 274, 653 N.E.2d 1340 (1st Dist. 1995) ............................ 69

56 People V. Baker, 9 Ill. App.3d 654, 292 N.E.2d 760 (4th Dist. 1973) ............................ 69

57 People V. Reid, 136 Ill.2d 27,55, 554 N.E.2d 174 (1990)...... 69

58 People V Oaks, 169 Ill.2d 409, 662 N.E.2d 1328 (1996) ....... 59

59 People V. Turner, 56 Ill.2d 201, 306 N.E.2d 27 (1973) ....... 71

SD428 MCC#1

## IV

### NATURE OF THE CASE

The defendant-appellant appeals to this honorable Court from his conviction for first degree murder and his sentence of 52 years. No question is raised regarding the sufficiency of the pleadings.

## V

### ISSUES PRESENTED FOR REVIEW

1.    Whether the defendant was proven guilty of first degre murder beyond a reasonable doubt.

2.    Whether the trial court erroneously allowed impeach-ment of the defendant with his prior conviction.

3.    Whether the defendant's statement and evidence seized by the police were the product of an unreasonable search and seizure.

4.    Whether the defendant conviction should be reversed because the jury's verdict was based on inadmissable evidence.

5.    Whether the defendant knowingly and intelligently waived his rights to silence and counsel.

## VI
### JURISDICTION

This Court's jurisdiction is invoked under this honorable Court's rule 602 and 603, in that this is an appeal by the defendant from final judgment in a criminal case.

The defendant-Appellant, Robert Warren (pro-se) was found guilty of first degree murder on August 28th 1998. The defendant's post-trial motion was denied on November,12, and the court imposed sentence that same day.(C.938,941) Notice of appeal was filed November 16th,1998. Appellate Court (2d Dist) Rule 23 order affirmed defendant's conviction on July 20th,2000. Petition for rehearing by defendant was filed on July 27th,2000. On August 8th 2000. defendant's petition for re-hearing was denied.     Defendant now appeals to this Honorable Court for review of his conviction.

On August 8,2000 the defendant file NOTICE OF INTENT to LEAVE TO APPEAL to the ILLINOIS SUPREME COURT and was granted.

(8)

VII

## STATEMENT OF FACTS.

On May 29,1995, the defendant-appellant, Robert Warren,
called 911 and notified the police of a confrontation he had
witnessed near the Fox River hehind the Post-Office in Elgin.
Mr. Warren reported seeing a short Hispanic man attacking another
man. The Hispanic man ran when Warren approached, and Warren
chased him, without catching him. (R.156057). Police officers
were dispatched to the area, and a man's body was found in the
river. (R-159). Lieutenant Copher "ordered" Officer Garcia to
bring Mr. Warren to the police station. (R-158-59,162). Garcia
drove Warren in his squad car to the station where he was placed
in a room with one-way locks. (R-164,188,262; C-108). after about
35 minutes, Garcia said, Detective Lullo arrived and talked with
the defendant and Garcia for about 10 to 15 minutes. (R_166).

Detective Lullo testified that he was called in to work
that night around midnight. (R-214) He was not briefed on the
investigation, but after five or ten minutes, Lullo drove to the
crime scene,about a 5 minute ride. (R-214-16). He viewed the
scene and the victim's body for 20 to 30 minutes, trying to get
an idea about what had happened. (R-217,218) Lullo saw severe
gashes on the victim,and he noted a blood trial on the grass and
the bicycle path. (R-217-18). Then he was briefed, and Lieutenant
Copher told him for the first time that there was a witness at
the police station. (R-219) Lullo went back to the police station
where he learned from Officer Garcia what Robert Warren had seen.
(R-220-21). Then Lullo met with Warren in order, he said, to get

SD428 MCC#1

more "in-depth as to what he had seen." (R-222). Lullo questioned Warren from about 2:00 to 2:20 a.m. (R-232).

Lullo testified that,at this first interrogation, he saw stains, including a large fresh grass stain, on Warren's jeans and what looked like blood on his shoes. (R-228). He then admitted that he did not, at this "first" interview, see a brown spot on Warren's pants that could have been blood. (R-229-30)

The detective then moved Warren into a different locked room. (R-231).Inside this second room Lullo thought he saw blood as well as dirt on the defendant's pants. (R-250,251,269-70,287) Lullo left Warren alone while he looked up his criminal history. Lullo testified that he always checks the criminal records of a witnessess and victims. (R-230). Sometime during this period, Lullo's partner, Detective Welter, arrived at the plice station. (R-233,236). Although Welter did not question the defendant at this point, Welter, according to Lullo's testimony in the pretrial hearing, observed Mr. Warren, and Welter told Lullo that he thought he saw blood on Warren's shoes. (R-228,250,287). Welter, however testified at trial that he first "encountered" the defendan at the 3:00a.m. interview. (R-1471078)

While the defendant waited in the second room. Detective Lullo had officers bring another homeless man to the police statio where Lullo and Walter questioned him, attempting to verify Warren's accont and to establish his credibility. (R-233-35;C.332) Lullo told Welter what he had learned and said they were now goin to treat the defendant as a suspect. (R-235,1452). Lullo tstified that he and Welter entered the room where they were holding the defendant and they asked for the defendant's

(10)

jacket, pants socks and hiking boots. (R-236,239,275,297). At trial, Welter denied that he was present when the defendant agreed to give up his clothes. (R-1471). The defendant was given a paper jumpsuit by the evidence technician, Officer Mayer, who took the clothes into evidence. (R-238,301). Mayer and the defendant did not talk to each-other at all. (R-297). Welter booked the defendant and inventoried and held his personal items including his money, $15.38, as was the practice for all subjects in custody. (R-1477, 1480).

At 3:00 a.m. the defendant was not free to leave. (R-288) Detective Lullo informed Mr. Warren of his rights pursuant to Miranda. (R-240;C.110). Lullo testified that Detective Welter was present when the rights were read to the defendant, (R-237), although Welter subsequebtly denied this. (R-1479). Lullo could not recall the rights that he read to the defendant, although he explained that one right was to have the Public Defender appointed to represent him for free. (R-277,280). Then the two detectives questioned Warren for another hour and 45 minutes. (R-243,276). At 4:45 a.m. the defendant agreed to make a tape recorded statement. (R-240). That statement began at 4:55 a.m. (R-240; C.110), and concluded at 5:15 a.m. (R-225; C,121). Warren again related his account of the confrontation he witnessed between two men near the Fox River. (C.110-121).

Detective Lullo next asked the defendant to provide a sample of his blood. (R-281). Two police officers took the defendant, wearing the paper jumpsuit and handcuffs, to Sherman Hospital. (R-256,407). Contrary to police testimony, the hospital records show the defendant arrived at the hospital at 4:23 a.m. and was discharged at 4:40 a.m. (C-99).

On Warren's return to the station, the police attempted to question the defendant further, but he said he did not want to talk anymore and asked for a lawyer. (R-257-58_. The Police contacted an assistant state's attorney. Assistant State's Attorney Stanfa advised them to let Mr. Warren go, and they did so. (R-288) The defendant left wearing a paper jumpsuit because his clothes had been confiscated as evidence. (R-293). Lullo wrote his report of the May 30th interview on June 22nd. (R-252). The clothing and blood obtained by police, along with a cane found in the river were sent to the Illinois State Police crime lab. (R-298-99).

Detective Lullo formally arrested Robert Warren on June 16th, and he was indicted for first degree murder on July 11,1995. (C-5,105). On October 17th, the defendant filed a motion to suppress his statements. (C-22). An amended motion to suppress his statement was filed on December, 13,1995. (C-28). A motion to quash arrest and suppress evidence was filed on May,16,1996. (C-41).

Clinical Psychologist Beth Tipton of the Kane County Diagnosti Center examined the defendant on March 26,1996, in order to test his intelligence and understanding of the Miranda warnings and to evaluate his fitness to stand trial, (R-315-20; C.48)[1] Dr. Tipton tested the defendant's intelligence using the Wechsler Adult Intelligence Scale Revised. (R-309,317-19). On march 29, Dr Tipton tested Warren's language abilities, using the Comprehension of Miranda Rights test, the Comprehension of Miranda Vocabulary test, and the test of the Adolescent Adult Language. (R-320)

Dr. Tipton interviewed Warren on several accasions, and specifically questioned him regarding the circumstances surrounding the police interrogation in 1995. (R-329,334). She also reviewed the records of Mr. Warren's previous admissions to Psychiatric hospitals and the police reports. (R-321,356). No copy of the rights allegedly given to Mr. Warren was in the reports. (R-368).

In April, Dr. Tipton attempted to assess whether Warren was faking his Psycholgical problems, using the Structured Interview of Reported Symptoms, but Warren because frustrated because he was unable to understand and answer the questions. (R-330-32). Dr. Tipton later gave him another of the malingering test and the results indicated he was not malingering. (R-331-32).

Dr. Tipton's written evaluations describe Mr. Warren's Psychiatric history, which began with psychiatric hospitalizations at age ten. (R-C-48). Dr.Tipton scored Warren's intelligence in the low average range. (R-319). She opined that the defendant was not fit to stand trial but could be made fit within one year.(C-50. She found he was in the lowest percentile of language comprehensio and suffred what she termed a "secere deficit" in comprehension. (R-328,334). The defendant had a receptive language disorder along with other emotional, behavioral, and control problems amounting to a mixed personality disorder. In Dr. Tipton's opinion based on the test results and her experience and training, Warren was incapable of understanding the Miranda warnings or waiving his rights on May 30th, 1995, due to the severity of his lanuage comprehension deficit. (R-336-37,370).

---

1- The doctor's written report of her evaluation dated May 13,1996
  is included in a motion to supplement the record filed along
  with appellate brief.            (13)

Dr. Tipton believed that it was especially difficult for the defendant to understand spoken language. (R-337). He might have understood the Miranda warnings if they had been given to him in written form. (R-368). The defendant was concerned about appearing stupid and had a tendency to :go along" even when he did not understand. (R-338). When Dr. Tipton interviewed the defendant the second time in August 1996, he was,she said, offended by her initial report and he showed her how much he had learned about courts and the law since he had been in custody. (R-332,339, 396).

On April 29,1997, Robert Warren testified that he was 27years old. (R-414). He had become a ward of the State at approximately age 5. (R-418). When asked how often he had been admitted to a mental health facility. Warren responded "in the twenties or thirties." (R-416). Warren had gone as far as tenth grade in a special education school. (R-413). He had trouble learning things. (R-414). In Court he recognized the Miranda warnings that he had heard on the "Cops " television program. (R-397,400) also, he studied "everything that I can in my case," including memorizing Miranda warnings. (R-398).

Warren remembered going to the police station with Officer Garcia. (R-394). He said Detective Welter told him he "would have to give up (his) clothes due to the fact that they would have to be excluded (sic) into evidence." (R-409). Warren explained that he thought excluding into evidence meant put into evidence. (R-409). He believed he had no choice, it was either :give up the clothes or suffer the consequences.: (R-409).

(14)

Warren recalled going to the hospital with two police officers. He was wearing a paper jumpsuit, handcuffs, and a metal loop through the belt. (R-407). On his return to the station, the cuffs and shackles were removed and he was placed in a cell until he was released sometime before noon, or at mid-morning. (R-411). He did not remember being given Miranda warnings (R-413).

The defendant said that although he had a prior conviction he had been arrested on a warrant and the Miranda warnings were not given, (R-423). At the time of the hearing, Mr Warren knew what the Miranda warnings were. (R-412). He agreed with Prosecutor that a tape recording would have been a good way to show he had been informed of his rights. (R-444).

The parties presented the stipulated testimony of Kathy Davis a nurse at Sherman hospital. Ms Davis would have testified that the defendant was admitted to the emergency room at 4:26 a.m. and, after having his blood drawn,was discharged at 4:40 a.m. (R-456). The court found that police had probable cause to arrest the defendant once they saw blood on his clothing and denied the defendant's motion to quash his arrest. (R-487).

The State's expert witness, Dr. F.P. Johnson, was permitted to examine Mr. Warren to determine his fitness for trial. (C-55) On July 24,1997, Dr. Johnson, a physician who specialized in psychiatry, testified that he interviewed the defendant on October 4,1996, in order to learn whether he had been timely given the Miranda warnings and whether he understood said warnings. (R-505)

(15)

Dr. Johnson interviewed the defendant a second time in February 1997. (R-510-11).

Dr. Johnson observed no sign of mental illness. (R-514). Dr. Johnson never asked the defendant how much he knew about the law before he was incarcerated in this case. (R-518). He said he could not "get into" Warren's head but the defendant "apparently" understood the Miranda warnings. (R-528) Dr. Johnson's opinion was that the defendant could have and did understand the warnings because he waived his rights.(R-512-13). Dr.Johnson noted that psychiatrists do not administer tests or interpret test data, asserting that "testing is the domain of the psycholgist." (R-519).

On September 24,1997, the court ruled that the first police station interrogation was not custodial, since police station interviews may be necessary for police investigations. (R-649-53). The Court found Detective Lullo's testimony credible. (R-654). Also the Court relied on Dr. Johnson's opinion "to a reasonable degree of psychiatric certainty," that defendant was able to understand and waive his Miranda rights. (R-660). It found that the defendant's assertion of his rights to counsel showed his understanding of his rights. (R-662). The Court also relied  on its observation that defendant was able to communicate and under-stand the testimony during the hearings. (R-661).  The motion to suppress statements was denied. (R-663). On May 26th,1998, the court denied the defendant's motion to reconsider. (R-849).

The case proceeded to jury trial on August 24,1998. (R-1081). The body found in the river on May 29,1995, was identified as

George Robotham, a 70 -year old homeless man whose wife lived in Elgin, Illinois at the time of Mr. Robotham death. (R-1268,1271). He walked using a four pronged cane. (R-1269).

Officer Garcia and Detective Lullo testified fundamentally the same as they did in the pretrial hearings, (R-1380-99), except that Lullo's trial testimony was that he first questioned the defendant about 1:00 a.m. (R-1403). Edward Cummings, an Elgin police officer, testified that he and two other officers pulled Robotham's body from the Fox River and laid it on the ground. (R-1280-81) Cummings found no vital signs. Paramedics were called and they pronounced the man dead. (R-1286). Detective Welter testified that he interviewed the defendant along with Detective Lullo about 3:00 a.m., after Lullo gave Warren his Miranda warnings and after Warren had given up his clothing and personal property. (R-1470-71). Welter booked the defendant. (R-1477,1480; C.105)

An autopsy was performed,which revealed that Robotham had been struck with a blunt object,stabbed, and choked. (R-1754-68,1795). The pathologist, Dr.Cogan, testified that he had been able to determine the cause of death. He did not inform the jury of his opinion as to the cause of death, although he noted that there was evidence of drowning and the victim had a heart disease. (R-1774, 1783). Dr. Cogan also stated that strangulation and the blow to the victim's neck were separately lethal, and the victim's shoulder was dislocated. (R-1772)

Dr. Beth Tipton testified that she had tested the defendant's intelligence in 1996.

(17)

Although he was not mentally retarded, he scored lower than 84% of the population. (R.1806-8) She also tested his language comprehension skills and found they were less than the bottom percentile in comprehension, or receptive language. (R.1808-10) Dr. Tipton determined that the defendant was not malingering, or faking his symptoms, (R.1811-12), and that he suffered from a learning disorder and "developmental receptive-expressive language disorder," meaning he had a problem understanding language. (R.1812-13)

After taking the tests, the defendant studied for the tests so he could do better next time. Dr. Tipton said for the defendant, taking the language comprehension tests was like answering questions in a foreign language. (R.1815) She noted that the defendant would become frustrated but not violent when he provided incorrect answers. (R.1837)

Mary Gray, a forensic scientist, testified as an expert on fingerprint evidence. (R.1505-7) She compared the defendant's fingerprints with three fingerprints she found on a train schedule and three envelopes found on the ground near the victim. (R.1517) One of the defendant's prints corresponded to a print found on an envelope. (R.1518) Gray found no fingerprints on the cane that was found in the river. (R.1522-24) Gray talked with Sergeant Turner at the Elgin Police Department on June 15, 1995 and told him she had found one of the defendant's fingerprints. (R.1543-44)

James Bald testified as an expert in forensic biology. (R.1553) Bald identified a blade of grass he examined on which he found blood that was consistent with George Robotham's blood and about 41 percent of all Caucasians. (R.1555-56) Bald also identified two stains on the defendant's right hiking boot as blood. (R.1557) One stain was about three by four millimeters, and the other one was about three by five millimeters. (R.1565) Bald removed the two stains and sent them to another lab which he understood would then send them on to Cellmark Diagnostics. (R.1560-62) There was no blood on the defendant's pants. (R.1575)

Charlotte Word of Cellmark Diagnostic testified as an expert witness in DNA analysis. (R.1582-87) She examined two blood stains and got no results from one stain. The other stain was consistent with the victim's blood. (R.1602-14)

Casey Swindle testified that he was then living in the Kane County Jail, having been arrested on charges of burglary and theft to a vehicle. (R.1639) He was also in jail in the fall of 1997, when he was facing charges of burglary, theft, criminal damage to property, a violation of probation, and attempted armed robbery. (R.1639-40) Swindle met the defendant in the jail. (R.1639-40) On November 3, 1997, Swindle talked to the defendant and contacted the State's Attorney's Office with the information he acquired. (R.1641, 1645) In exchange for his testimony against Robert Warren, the charge of attempted armed robbery was dismissed and a three-year sentence for burglary was imposed. (R.1644) He was released from the jail the same day he signed the agreement. (R.1645)

Swindle said that Warren told him that he knew George Robotham because they both had eaten at "the Mission." (R.1650) Warren saw Robotham on the bike path and demanded money from him. When Robotham refused, Warren hit him. According to Swindle, Warren got about six dollars from Robotham's wallet. Warren tried to throw Robotham in the river and thought he got blood on his tennis shoes. Warren called 911, so they would not think that he did it. (R.1650-53) Swindle denied reading Warren's police reports. (R.1660) He and Warren had fought while in the jail. (R.1676)

Ronald Corbin also met the defendant in jail. He agreed to testify against the defendant in exchange for a ten-year sentence for residential burglary. (R.1687-91) Corbin testified that on August 25, 1997, he saw the defendant point his finger or a pen at another inmate and heard the defendant say he was "going to kill [another inmate's] ass just like that old man," and make a choking motion with his hands. (R.1693-94)

Robert Warren testified that he was homeless and would sometimes go to the Wayside Mission for help, and he would also do volunteer work there. (R.1876-77) He knew George Robotham from the Mission and from seeing him at shelters and soup kitchens. Robotham sometimes received mail at the Mission. (R.1879) About a week before his death, Robotham came to the Mission. Robotham showed a document to the defendant and asked him what he thought about it. (R.1932)

**(20)**



Warren described what he saw on the night of May 29, 1995. (R.1879-91)
He explained that he went to the police station after calling 911 because he had
nothing to hide. (R.1891-93, 1925) Warren denied committing the offense.
(R.1895)

Both parties rested on August 27. (R.1936) The following day the court
permitted the State to enter the defendant's prior burglary conviction into evidence
before closing arguments. (R.1955-69) The parties agreed to allow the court to
read the conviction to the jury. (R.1974) That same day the jury returned a verdict
of guilty. (R.2076-77; C.395)

The defendant's post trial motion was filed on November 4, 1998. (C.422)
On November 12, the court heard argument and denied the motion. (C.938;
R.2085-2108) The court then heard evidence and argument regarding the sentence
and imposed a 52-year prison term. (R.2155-63)



## ARGUMENT

### I.

**Because the State's case consisted of a single fingerprint and other circumstantial evidence and because the State contended that the victim was first hit on the back of the head with his own cane, then choked and stabbed, and finally drowned, and where the defendant reported the crime and fully cooperated with the police, the State failed to prove Robert Warren guilty of murder beyond a reasonable doubt.**

The prosecution's theory of the case was that Robert Warren, a homeless man, came upon George Robotham, another homeless man, on the night of May 29, 1995. (R.1271) Warren supposedly first struck Robotham on the back of the head with Robotham's own cane and knocked him down. (R.1987) Warren took the papers Robotham kept in his pocket, left a single fingerprint, and threw the papers on the ground. (R.1983) Then Warren purportedly stabbed Robotham and threw him and his cane in the river, (R.1990), but left Robotham's papers in plain view. (R.217, 1867) A total of 24 wounds were inflicted during the brutal attack, but Warren managed to get only two tiny drops of blood near the sole of one of his boots. (R.1556, 1558, 1792) One drop of blood was inconclusively tied to the victim. (R.1605-6, 1614) Not only was the blood evidence not DNA matched to anyone, but there was no evidence of how long the blood had been on Mr. Warren's boot.

No one observed Mr. Warren's conduct or heard Mr. Robotham cry out. After the attack, Mr. Warren went to a bar and called the police in order to deflect

suspicion from himself. (R.1653) Although he could not know whether he was covered in blood from the attack, he willingly went to the police station where he related a story about a short Latino man and agreed to give the police a sample of his blood and all his clothes. (R.6, 158-59) Stains were found on the defendant's clothing, but forensic testing revealed they were not blood and they were not caused by the black rubber tips from Robotham's cane. (R.1845-47)

Hair was found on Mr. Warren's clothes but it was not identified as belonging to the victim. (R.1859-60) No skin tags were found on the hairs. (R.1860) Several fingerprints were found on the victim's papers, but only a single print was connected to the defendant and there was no proof that it was left at the time of the crime. The police confiscated the money Warren carried on May 29, but did not have it tested for fingerprints. (R.1480, 1483) They took Warren's personal property but did not find the victim's wallet or anything else belonging to the victim. (R.1477) The police found no footprints besides their own at the crime scene. ( R.1371) In sum, the State's consisted only of circumstantial evidence.

The standard for reviewing the sufficiency of the evidence in a criminal case is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the material and essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 169 Ill.2d 132, 152, 661 N.E.2d 287 (1996); *People v. Scott*, 148 Ill.2d 479, 542, 594 N.E.2d 217 (1992).

Under



Here, with only a single fingerprint indefinitely connecting the defendant to the crime, he was not proven guilty beyond a reasonable doubt.

Circumstantial evidence is indirect proof of the principal facts of a case, which can only be inferred from one or more circumstances directly established. *People v. Robinson*, 14 Ill.2d 325, 331, 153 N.E.2d 65 (1958), cited in *People v. Hodogbey*, 306 Ill.App.3d 55, 714 N.E.2d 1072 (1st Dist. 1999). This type of evidence may be sufficient to sustain a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged. *People v. Gomez*, 215 Ill.App.3d 208, 216, 574 N.E.2d 822 (2d Dist. 1991). It is not necessary that each link in the chain of circumstances be proved beyond a reasonable doubt, rather, it is sufficient if all the circumstantial evidence taken together satisfies the jury beyond a reasonable doubt of the defendant's guilt. *Gomez*, 215 Ill.App.3d at 216.

Fingerprints are circumstantial evidence. *Gomez*, 215 Ill.App.3d at 216. In order to sustain a conviction solely on fingerprint evidence, fingerprints corresponding to those of the defendant must have been found in the immediate vicinity of the crime under such circumstances as to establish beyond a reasonable doubt that they were impressed at the time the crime was committed. *People v. Campbell*, 146 Ill.2d 363, 386, 586 N.E.2d 1261 (1992) (the same time/placement requirement for shoeprint evidence). Here the State presented no evidence establishing beyond a reasonable doubt that the defendant's fingerprint was left on

(24)



the night of May 29.

Three fingerprints were found on a train schedule and envelopes and papers that were found on the ground and apparently belonged to the victim. (R.1517) Of the three prints only one matched Robert Warren's fingerprint. (R.1522) The State presented no proof of when the defendant made the print. To refute the prosecution's claim that this print was evidence of Warren's culpability, the defense presented evidence that was unrebutted by the State that Warren and Robotham had previously met at homeless shelters and soup kitchens where Robotham had shown Warren some documents. (R.1878-79)

The facts in this case are similar to those in *People v. Gomez*, 215 Ill.App.3d 208, 574 N.E.2d 822 (2d Dist. 1991), where this Court determined that the defendant had not been proven guilty of murder beyond a reasonable doubt and reversed the conviction. 215 Ill.App.3d at 219. In *Gomez*, the case against the defendant consisted of a single fingerprint that was found in the victim's kitchen and other circumstantial evidence, including inconclusive hair, paint, and blood evidence, and the defendant's allegedly fleeing the area. 215 Ill.App.3d at 219. Together, the value of this evidence did not sufficiently corroborate the circumstantial fingerprint evidence to warrant a guilty verdict. 215 Ill.App.3d at 219.

This Court distinguished *Gomez* from the facts in a theft conviction, noting

that the "physical and temporal proximity criteria come into play only when a conviction is based solely upon circumstantial fingerprint evidence." *People v. Zizzo*, 301 Ill. App.3d 481, 490, 703 N.E.2d 546 (2d Dist. 1998). Because in *Zizzo*, the defendant's fingerprints were used to corroborate a witness' prior inconsistent statement, the prints were not "the sole basis for the defendant's conviction." 301 Ill.App.3d at 490.

Unlike *Zizzo*, the single fingerprint here was not used as corroboration of a prior inconsistent statement, but was the only evidence connecting Robert Warren to the crime. The State's attempted corroboration consisted of other circumstantial evidence, a single inconclusive blood sample and the dubious testimony of two jail inmates, James Corbin and Casey Swindle. Because the blood sample was not definitely determined to belong to the victim, its presence on the defendant's boot was inclusive evidence of the defendant's guilt. And the stories of the two men from the Kane County Jail were obtained two years too late to merit credence as jailhouse confessions.

In *People v. Irby*, 237 Ill. App.3d 38, 602 N.E.2d 1349 (2d Dist. 1992), this Court stated: "When it appears a witness has hopes of a reward from the prosecution, his testimony should not be accepted unless it carries with it an absolute conviction of its truth." 237 Ill.App.3d at 59, citing *People v. Williams*, 65 Ill.2d 258, 357 N.E.2d 525 (1976). Thus, even if the testimony of Corbin and

**(26)**

B4288 MGG#11

Swindle constituted direct evidence against the defendant, there was still no proof beyond a reasonable doubt. The inmates allegedly learned the facts of the case against the defendant from the defendant more than two years after the offense, when the facts of the case were no secret. The facts were in newspapers as well as in the discovery documents in the defendant's custody.

It is equally feasible that Mr. Warren outright lied to other inmates while in custody in order to bolster his reputation and guarantee his own safety during the three years he waited for trial in the Kane County Jail. Or, the two inmates could easily have heard that the defendant was in custody for an attack on an old man and fabricated his purported jailhouse admissions. In fact, mistakes were made by each the two convicts. Swindle testified incorrectly that blood was found on Warren's "tennis shoes," (R.1652), when the footwear was actually hiking boots. (R.1351, 1352, 1556, 1562) Corbin claimed he heard the defendant threaten to kill another inmate "just like that old man," and he made a choking motion with his hands. (R.1694) The forensic evidence, however, showed that whoever choked Mr. Robotham did so using an object, not his or her hands. (R.1768-69) Thus, there can be no "absolute conviction" that Corbin and Swindle testified truthfully. Taken together, their testimony is far from proof beyond a reasonable doubt.

In addition, the cause of George Robotham's death was never told to the jury. He may have died of a heart attack, having suffered from heart disease,



according to the pathologist. (R.1783)

Furthermore, Robert Warren did not flee from the authorities, but he actually reported the crime and naively cooperated with the police for several hours, thinking he was helping to catch the real offender. (R.1396, 1419) Warren immediately reported the crime he had witnessed. According to the State, he worked with the police right after violently attacking a man, causing numerous bloody wounds, and without taking time to spend the money he took, or to examine his clothes for blood or change into clean clothes. The pathologist testified that the victim was alive when his body entered the river, (R.1774), so the attacker likely was unaware he later died.

The police made no attempt to determine if the small amount of cash they took from Mr. Warren could be connected to the victim. Similarly, no report of Mr. Warren's spending said money was made. Nor could the State explain why Warren threw the cane into the river when it carried no fingerprints, but after touching the victim's papers, he allegedly left them scattered on the ground in plain view. The State even failed to explain how or why the victim was first hit on the back of his head with his own cane, when he would have seemingly been using said cane to hold himself up.

The police testimony itself was not without blemishes. Detective Lullo admitted during the trial that in his sworn statement used to obtain the arrest



warrant for Mr. Warren, in June 1995, he "incorrectly" stated that the defendant's fingerprints were "all over" the victim's papers. (R.1453-57) Lullo admitted he had previously made a "word error" on a search warrant for which he was formally reprimanded. (R.918, 1457) Also, he had received a one-day suspension for an "inaccuracy" or "inconsistency" on his time sheets. (R.897, 923)

Lullo erred again either in his testimony in the pretrial hearings, when he was sure his first interrogation of the defendant began at 2:00 a.m., or at trial, when he testified it began at 1:00 a.m. (R.1403) Also, the Grand Jury only indicted the defendant after Detective Lullo embellished the evidence against him. Lullo incorrectly testified that he talked to the Rockford Crime Lab and was told the defendant had left "fingerprints" on the victim's papers, (S.R.12-15[2]), when in fact, he had not personally talked to anyone from the lab, and only one of the defendant's prints was found. (R.1535, 1544) Moreover, Lullo led the Grand Jurors to believe that the cold water and the current in the Fox River destroyed the fingerprints on the victim's cane. (S.R.14-15) This was apparently pure conjecture by Detective Lullo, because the State's fingerprint expert testified at trial that colder water would likely have <u>better</u> preserved any fingerprint evidence, and she made no reference to the current of the river affecting fingerprint evidence. (R.1524-25)

---

[2]The report of the proceedings of the Grand Jury are included a motion to supplement the record filed along with **APPELLATE BRIEF.**

The only evidence against Robert Warren was that he had at some unknown time touched a piece of paper belonging to the victim. (R.1530) The State had only the dubious testimony of two jail inmates who testified against Warren in order to obtain better plea agreements with the State. (R.1639-45, 1664-67, 1687-94), and a tiny drop of blood on the sole of one of Warren's boots that could not be DNA matched to Robotham. (R.1605-6) The State's evidence can not fairly be said to amount to proof beyond a reasonable doubt.

The facts of this case, considered in the light most favorable to the prosecution, raise a reasonable and compelling doubt of the defendant's guilt and are completely inadequate to prove the defendant guilty of murder. Testimony of two habitual criminals who cut deals with the State, two tiny drops of blood that were not unequivocally connected to the victim, and a single fingerprint that could have been left during prior meetings between the victim and the defendant completely fail to eliminate reasonable doubt. Because the State failed to prove the defendant guilty beyond a reasonable doubt, the defendant's conviction should be reversed without remand.



## II.

**The trial court erred by permitting the admission of evidence of the defendant's prior criminal conviction as impeachment, and, pursuant to *People v. Thomas* and *People v. Atkinson*, by restricting the impeachment to the mere-fact method.**

In a pretrial motion, the defendant sought to prevent the admission of evidence regarding his prior convictions. (C.363-64) The trial court ruled that if the defendant testified, his 1993 robbery conviction would be admissible as impeachment, using the "mere-fact" method of impeachment. (R.1070) The trial court's ruling should be reversed for three reasons. First, the court failed to conduct the balancing test required by *People v. Montgomery*, 47 Ill.2d 510, 268 N.E.2d 695 (1971). Secondly, the evidence should not have been admitted where it was extremely prejudicial and only slightly probative. *Montgomery*, 47 Ill.2d at 517. Third, this Court and the Illinois Supreme Court have ruled that the mere fact method is improper impeachment as a matter of law. *People v. Atkinson*, 186 Ill.2d 450, 459, 464, 713 N.E.2d 532 (1999); *People v. Thomas*, 220 Ill.App.3d 110, 117-18, 580 N.E.2d 1353 (2d Dist. 1991).

The determination of whether a witness' prior conviction is admissible for impeachment purposes is within the discretion of the trial court. *Montgomery*, 47 Ill.2d at 517-18. The court must balance the prejudicial effect of the evidence against the probative value. 47 Ill.2d at 517. The Supreme Court reviewed and reiterated its ruling in *Montgomery* in *People v. Williams*, 161 Ill.2d 1, 641 N.E.2d



296 (1994), and again in *People v. Williams*, 173 Ill.2d 48, 670 N.E.2d 638 (1996). The Supreme Court stated that prior convictions should not be indiscriminately admitted and that it was critical that the balancing test mandated by *Montgomery* be applied. 173 Ill.2d at 81-82.

Here, the trial court enunciated the factors listed in *People v. Medreno*, 99 Ill.App.3d 449, 452, 425 N.E.2d 988 (3d Dist. 1981), as commonly used to strike the proper balance, but did not explain how it arrived at its ultimate conclusion that the conviction would be admitted. (R.1068-71) The court read all seven of the factors with only brief comments, as it did after inquiring "One, whether the prior conviction is veracity-related. I think certainly, arguably, both burglary and robbery involves an element of dishonest or stealth." (R.1069) The court concluded its ruling as follows:

> Whether the prior offense is similar to the instant offense, thus increasing the danger of prejudice.
> I know that neither of the offenses are the same offenses [sic] for which Mr. Warren is currently being placed on trial for.
> The need for the witness' testimony.
> Whether the witness' credibility is a central issue to the determination of the truth. It would appear that it would be in this case.
> So, balancing all those factors and considering those factors, based upon my assessment of the totality of the factors in this case, I'm going to allow the State to impeach the defendant with the 1993 robbery conviction. However, I'm going to apply the mere fact rule, which is when the State would normally introduce this in rebuttal, that the jury is going to find out that the defendant had committed a felony, the date and the county in which it occurred.



(R.1070-71)

First, the trial court's comments show that it failed to apply the appropriate test. The court stated that it had "balanced all those factors," referring to the factors that may assist a court in making its determination. (R.1070) The *Montgomery* test requires a trial court to find evidence is inadmissible if the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice. *Montgomery*, 47 Ill.2d at 516; *Williams*, 173 Ill.2d at 81. Thus a court must balance, not "all those factors," but the probative value versus the prejudice to the defendant.

The trial court here applied the wrong test when it "balanced all those factors," but failed to answer the critical question of whether the defendant would be unfairly prejudiced by evidence of his prior conviction. The seven factors listed by the trial court are commonly used to reach the ultimate question of probative value versus unfair prejudice, but probative value versus unfair prejudice are what the court should have balanced. *Montgomery*, 47 Ill.2d at 517-18.

The trial court stated that the defendant's credibility was "a central issue to the determination of the truth," (R.1070), but then ruled in such a way that crucial evidence on that "central issue" was withheld from the jury. The State advanced a single reason for admitting the prior convictions, asserting that the defendant's prior convictions were probative of his veracity and were therefore proper impeachment,



relying on *People v. Williams*, 173 Ill.2d 48. (R.1064-65) The State never claimed that the robbery conviction was admissible for any other proper purpose, e.g., in order to establish bias, interest, or motive. But the State also never explained how the prior robbery conviction would detract from the defendant's ability to testify truthfully in this case. The manifest reason for the State to introduce the prior conviction was as evidence of his guilt in his case, which is positively prohibited. *Williams*, 161 Ill.2d at 39.

The prosecutor argued that it should have been allowed to present both of the defendant's prior offenses, citing *People v. McKibbins*, 96 Ill.2d 176, 449 N.E.2d 821 (1983) (R.1067) In *McKibbins*, however, the defendant had admitted his part in the armed robbery and murder cases for which he was on trial, but he claimed his own involvement was innocent. The evidence of other crimes the defendant committed after the armed robbery and murder with the same companions was introduced in order to dispel the defendant's claims of an innocent state of mind and lack of criminal intent. Thus the other crimes evidence was admissible for a purpose other than to show the defendant's propensity to commit crime. 96 Ill.2d at 186. No similar purpose was alleged here.

The defendant suffered great prejudice by the admission of evidence of his prior robbery conviction because the State's theory of the case was that the defendant was attempting to rob George Robotham when he killed him. The State

was without direct evidence of its theory, and the prior robbery would have lent

support to its assertion of Warren's guilt because if he did it before, he did it again.

Courts must protect defendants from such unduly prejudicial evidence. *Williams*,

161 Ill.2d at 39-40.

The trial court refused to suppress Warren's criminal history, but allowed

only one conviction into evidence and limited its admission to the "mere-fact"

method. (R.1070) The court's decision suggests that it was aware of the enormous

prejudice the defendant would suffer if the jury learned he had previously been

convicted of robbery. The court may have been trying to encourage the defendant

to testify when it admitted the evidence as "mere-fact." Or the court may have been

seeking to mitigate the prejudice to the defendant by "sanitizing" the prior

conviction by refusing to allow the jury to learn what it was for. In addition, use

of the mere-fact method was approved by defense counsel and the prosecutor.

(R.1066, 1499, 1504) But neither the trial court's good intentions nor counsel's

actions can overcome the fact that use of the mere-fact method was not the law in

Illinois.         This Court explicitly rejected the use of the mere-fact method in

*People v. Thomas*, 220 Ill.App.3d 110, 580 N.E.2d 1353 (2d Dist. 1991), as

contrary to the current state of the law. "[A]doption of such a rule should emanate

from our supreme court. Since no such rule has, thus far, been adopted, the trial

court acted appropriately in applying existing State law to deny defendant's pretrial



motion to prevent any introduction of defendant's prior record or, in the alternative, to sanitize his prior convictions by referring to them strictly in a general sense as 'felonies.'" 220 Ill.App.3d at 118. Therefore, in 1998, when the defendant's trial began, the trial court had no discretion to permit the "mere fact" of the defendant's prior convictions to be presented to the jury.

Furthermore, in *People v. Atkinson*, 186 Ill.2d 450, 713 N.E.2d 532 (1999), the Illinois Supreme Court held that use of the mere fact method of impeachment is improper as a matter of law. The Court noted that when the mere fact method is used to impeach a defendant, its use is particularly harmful because jurors likely have an indistinct sense of the range of offenses connotated by the term "felony." 186 Ill.2d at 459-61. The mere-fact method presents the jury with direct proof that the accused has been convicted of a felony, but excludes the exact nature of the crime. "There is potential danger that the jury would speculate that the defendant was previously convicted of a more serious crime." 186 Ill.2d at 461. In sum, "it is the nature of a past conviction, not merely the fact of it, that aids the jury in assessing a witness' credibility." 186 Ill.2d at 461. As the Fourth District Appellate Court has observed: "Perhaps it was better for the defendant for the jury to know he had been convicted of theft and deceptive practice rather than to speculate that he had been convicted of something like armed robbery or murder." *People v. Scott*, 278 Ill.App.3d 468, 476, 663 N.E.2d 97 (4th Dist. 1996).

In this case, the error was especially egregious because the State forgot to impeach the defendant before it rested. (R.1955) Therefore, instead of the jury hearing the evidence from the prosecutor during the normal course of the trial, the judge read the "mere fact" of the defendant's conviction before closing arguments and presented it in the form of a stipulation between the parties. (R.1973-74) This unique treatment of a single piece of evidence may well have increased its importance in the minds of the jury.

Additionally, the two jail inmates who testified against the defendant placed their full criminal records before the jury. (R.1500-4) Both Swindle and Corbin thoroughly explained their past and present situations, and their apparent candor may have helped the jurors believe they were testifying honestly and may well have amplified their credibility.

Under the unique circumstances of this case it can not be said beyond a reasonable doubt that this error is harmless. Illinois Supreme Court Rule 615(a). The impact of the trial court's erroneous ruling and the use of the mere-fact rule goes to the heart of this circumstantial case where credibility was critical. Because it can not be said that these errors did not affect the jury's decision, the defendant's conviction must be reversed and the case remanded for a new trial as an alternative to the relief requested in Argument I of this Brief.



## III.

**Where the police, without a warrant or probable cause, brought Robert Warren to the police station before midnight and took all of his clothes, his boots, and a blood sample, and held him until at least 6:00 a.m., while investigating his background and account of the night's events, the pretrial motion to quash his arrest should have been granted because this is exactly the kind of coercive police practice from which suspects must be protected.**

Robert Warren was illegally arrested when the police, without a warrant or probable cause, detained him after he reported a crime to the authorities. The totality of the circumstances, established by the police testimony, prove that the defendant was held in a coercive environment and reasonably believed he had no choice but to cooperate with every police demand from the time he was brought to the police station before midnight until his release, sometime after 6:00 a.m. In particular, the defendant was illegally seized by 2:20 a.m., when he was not permitted to leave the police station but was kept in a locked room while the police investigated the case.

Both the United States and Illinois Constitutions protect individuals from unreasonable searches and seizures. U.S. Const., Amend. IV; Ill. Const. 1970, Art. I, § 6. A seizure, for purposes of the Fourth Amendment, is synonymous with an arrest. A person has been arrested when his freedom of movement has been restrained by means of physical force or a show of authority. *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S. Ct. 1870, 64 L.Ed.2d 497 (1980). To quash an arrest, the defendant must show both that a seizure occurred and that it was illegal. *People v. Graham*, 214 Ill. App.3d 798, 573 N.E.2d 1346 (1st Dist.

**(38)**



1991). An officer may only arrest a person when he has an arrest warrant or "he has reasonable grounds to believe that the person is committing or has committed an offense." 725 ILCS 5/107-2 (1995). Probable cause to arrest does not require the degree of proof necessary for conviction, but more than a hunch or mere suspicion is required. *People v. Bell*, 96 Ill. App.3d 857, 869, 421 N.E.2d 1351 (1st Dist. 1981).

A trial court's determination on a motion to quash arrest and suppress statements and evidence will not be overturned unless it is manifestly erroneous. *People v. Galvin*, 127 Ill.2d 153, 162, 535 N.E.2d 837 (1989). Manifestly erroneous means arbitrary, unreasonable and not based on the evidence. *People v. Wells*, 182 Ill.2d 471, 481, 696 N.E.2d 303 (1998). A reviewing court will not reverse a trial court's decision merely because different conclusions can be drawn; an opposite conclusion must be clearly evident. *In re Rutland Fire Protection District*, ___ Ill.App.3d ___, 714 N.E.2d 592, 239 Ill.Dec. 673, 678 (2d Dist. 1999). In reviewing a motion to quash arrest, the reviewing court must consider as true the testimony of the police officers, except where the defendant's testimony is unrebutted, so as to not substitute its judgment for that of the trial court on issues of credibility. *People v. Young*, 206 Ill.App.3d 789, 800, 564 N.E.2d 1254 (1st Dist. 1990).

The defendant witnessed a physical assault and immediately reported what he

had seen to the police. Although in the pretrial hearings, Detective Lullo was positive

his first meeting with the defendant was from 2:00 to 2:20 a.m., (R.232), at trial he

was just as adamant that his interrogation began at 1:00 a.m. (R.1403) After

Detective Lullo finished his interview of Mr. Warren, either at 1:20 or 2:20 a.m.,

Lullo did not show Warren the door, but instead he moved Warren into a different

room within the police station, while Lullo, with the assistance of other police

officers, attempted to check whether Warren's report was true by questioning another

man and investigating the defendant's criminal record. (R.232) Also, Detective Lullo

testified that he was suspicious of Mr. Warren because his hair was wet, although it

was then more than two hours after Warren had been brought into the station, and

because, after Warren was taken out of the first room and put in the second room,

Lullo saw something that could have been blood on Warren's pants and shoes.

(R.228, 230, 267-70)

Detective Lullo testified that after questioning Warren, he was suspicious,

but he had no evidence with which to charge Mr. Warren. (R.288) Lullo admitted

he did not have probable cause, but that he detained the defendant simply because

he "wasn't really liking what was going on, what I saw." (R.230, 271)

Once Detective Lullo "hooked up" with his partner, they had an unidentified

officer bring  another homeless man to the police station in order to question him

about what Warren had reported.  (R.233, 272) Lullo's suspicion, or, in his

words, not really liking what was going on, was legally inadequate to hold Mr.



Warren. Keeping a person in a police station while the police gather evidence against him constitutes a seizure. <u>See</u>, <u>e.g.</u>, *People v. Walls*, 220 Ill. App. 3d 564, 579, 581 N.E.2d 264 (1st Dist. 1991). Therefore, the trial court erred by failing to suppress the evidence against Robert Warren and quash his arrest.

The prosecution offered no lawful explanation for the continued detention of Mr. Warren after Detective Lullo completed his interrogation at 2:20 a.m. This case is factually similar to *People v. Young*, 206 Ill. App. 3d 789, 564 N.E.2d 1254 (1st Dist. 1990), where an illegal detention was found. In *Young*, the defendant voluntarily went to the police station where he was briefly questioned and then left in an interview room for 16 hours. During the initial questioning, the defendant was not given *Miranda* warnings and he never implicated himself. Yet the defendant remained overnight while the police collected information adequate to provide probable cause for his arrest. No one told the defendant he did not have to go to the police station. The police never informed the defendant that he was free to leave nor, in the opinion of the Appellate Court, offered an adequate explanation for the defendant's continued presence in the station. After holding the defendant for several hours and questioning other witnesses, the police considered the defendant to be under arrest, although the defendant was not so informed until sometime that afternoon. The Appellate Court rejected a detective's testimony that the defendant was at the station for questioning because the defendant was only questioned briefly

at the commencement of his 16-hour stay. The Court said, "[i]f mere questioning was the goal, he would not then have been ignored and left to spend the entire night in a small, windowless room, lacking in basic facilities, with the door closed. There is no indication that defendant ever was told he was free to leave that small interview room that night." 206 Ill. App.3d at 801. Thus, the Appellate Court found that the defendant's stay at the police station amounted to an illegal detention.

Like the defendant in *Young*, Mr. Warren was ostensibly taken to the police station as a witness. He was transported in Officer Garcia's squad car with the doors locked. (R.188) The police records show Warren was booked in at 11:51 p.m. (C.105) No one told Warren he did not have to go to the police station, or that he could leave. Detective Lullo claimed he questioned Mr. Warren as a witness. (R.480) Warren never implicated himself, yet he was held for several hours, without food, sleep, or the chance to communicate with family or friends, while sitting in two different windowless rooms used to interview suspects as well as witnesses. (R.261, 1447) He had completely described what he had seen to Detective Lullo by 2:20 a.m. (R.232) Mr. Warren's part in the investigation, that of a witness, was then complete. The police had accomplished their articulated purpose for bring the defendant to the station. Instead of thanking him for his help and driving him home or at least telling him he could go, Warren was moved into a different locked room. (R.231)



As in *Young*, the asserted purpose of bringing the defendant to the police station was accomplished after the initial questioning. The State did not assert that the defendant explicitly agreed to remain, or make any attempt to explain why the defendant, or any reasonable person, would choose to remain. In fact, the State's report of the time period after Detective Lullo questioned Mr. Warren, from 2:20 to 3:00 a.m. consisted entirely of what Lullo and other police officers did. There was no description of what the defendant did or said; he was ignored. What was reported by the police was that sometime before 3:00 a.m., they took all of Warren's clothes because they considered him a suspect. (R.235, 236, 275, 301) By then, Warren was not free to leave, but neither was he formally advised he was under arrest. Warren was still in a locked room, (R.262), and Lullo testified that before the 3:00 a.m. interview commenced, he considered Mr. Warren to be a suspect. (R.223, 231, 262, 288) In fact, the police continued to hold Mr. Warren until an assistant state's attorney told them to release him but to keep his clothes. (R.288, 293)

The length and scope of an investigative detention must be "strictly tied to and justified by" the circumstances which rendered its initiation permissible. *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *People v. Safunwa*, 299 Ill. App.3d 707, 711, 701 N.E.2d 1202 (2d Dist. 1998). When a person's freedom of movement is restrained by either a show of authority or by

physical force, that person has been seized within the meaning of the Fourth Amendment. *Mendenhall*, 446 U.S. at 553-54. A seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." *Terry*, 392 U.S. at 16.

In *People v. Holveck*, 141 Ill.2d 84, 565 N.E.2d 919 (1990), the Illinois Supreme Court found the police restrained the defendant's freedom of movement by a show of authority when officers pulled over the defendant without probable cause and then took him to the police station and seated him in a guarded interrogation room. These circumstances justified the defendant's belief that he was not free to leave. 141 Ill.2d at 97-98. At the station, the defendant was questioned by a detective, who gave the *Miranda* warnings and began questioning the defendant though, at the time of questioning, the defendant was not a suspect. Approximately 10 minutes into the interrogation, the defendant made incriminating statements and was placed under formal arrest. 141 Ill.2d at 97-98. The Illinois Supreme Court noted that the giving of *Miranda* warnings alone was not sufficient to purge the taint of an illegal arrest and detention, and held that the statements were properly suppressed. 141 Ill.2d at 98.

In this case, since there was not a typical "stop," the police articulated no reason to stop the defendant. However, the illegal detention of the defendant had begun by 2:20 a.m. when Detective Lullo "moved" Mr. Warren instead of sending



him home. The detention of the defendant lasted far longer than was necessary to effectuate any appropriate purpose.

In *Young*, the Appellate Court cited another case with similar facts, *People v. Gordon*, 198 Ill.App.3d 791, 556 N.E.2d 573 (1st Dist.1990), where the trial court's denial of a motion to suppress was also reversed. In *Gordon*, the police claimed the defendant was taken to the police station as a witness and he agreed to spend the night sleeping in chairs at the police station in order to insure his sobriety for a polygraph test. *Young*, 206 Ill.App.3d at 802; *Gordon*, 198 Ill.App.3d at 798.

Here, the comparable claim by the State may be that Mr. Warren was taken to the police station as a witness and he consented to sitting in a locked room all night, giving away his clothes, his boots, his blood, and his tape recorded statement because he wanted to help the police. As the Appellate Court found in *Gordon*, such an explanation is inadequate. The fact that a defendant initially accedes to a police request to accompany them to the police station does not legitimize the treatment of the defendant after he arrived at the station. The *Gordon* Court held:

> Thus, regardless of the label used to characterize the detainment, where a defendant is subjected to such an interrogation without probable cause, a violation of the fourth amendment's protection against unreasonable searches and seizures, including seizure of the individual occurs. Evidence obtained as a result must be suppressed absent demonstration that there were sufficient intervening circumstances which purged the taint of the illegal arrest.

198 Ill.App.3d at 796.



In determining what a reasonable person would believe under the circumstances, courts may look to several factors as indicia of coercion. These include the time and place of the confrontation, the number of officers, the presence or absence of family or friends, the presence of conduct normally involved in a formal arrest procedure, such as physical restraint, the show of weapons or force, booking or fingerprinting, and the manner by which the accused is transported to the police station. *Gordon*, 198 Ill.App. 3d at 796. The test focuses on the coercive effect of police conduct as a whole, and not on each particular detail in isolation. *People v. Stofer*, 180 Ill. App.3d 158, 166, 435 N.E.2d 1287 (1st Dist. 1989).

In the instant case, the police claimed to have issued *Miranda* warnings about three hours after Officer Garcia brought him to the police station. It is true that no one told the defendant he had to remain in the station, he was permitted to use the washroom, and apparently the only time he was handcuffed was during his trip to and from the hospital for the taking of his blood. However, these factors do not negate the fact that the police created an atmosphere in which Mr. Warren would reasonably believe that he was not free to leave. Because the circumstances surrounding Warren's stay with the police supported his belief that he was not free to leave, this Court should agree that that he was illegally detained.

In the trial court the prosecutor cited *People v. Longoria*, 117 Ill.App.3d

241, 452 N.E.2d 1350 (2d Dist. 1983), for his claim that, in a case where a defendant comes voluntarily to a police station, and then after initial questioning and "exploration of other matters he's determined to be a suspect, and is Mirandized, as he was here, the previous statements are not suppressible." (R.7)   The prosecutor, however, misunderstood *Longoria*. The questions before the Court in *Longoria* were whether the defendant was in custody when he spontaneously began speaking to the police on the way to the police station, and whether the *Miranda* warnings given to the defendant were timely. This Court specifically found that "no interrogation occurred until after [the defendant] had been advised of his *Miranda* rights." 117 Ill.App.3d at 250.   Therefore, the question raised in Mr. Warren's case was not before this Court in *Longoria*. Furthermore, *Longoria* does not stand for the proposition argued by the prosecutor. As discussed above, the police may not hold a suspect while "exploring other matters" and attempting to obtain probable cause. See, e.g., *Brown v. Illinois*, 422 U.S. 590, 605, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *People v. McKinney*, 277 Ill.App.3d 889, 661 N.E.2d 408 (1st Dist. 1996).

The State conceded in the trial court that the police had neither a warrant nor probable cause, but claimed that the defendant consented to come to the police station at midnight, give up all of his clothes shortly before 3:00 a.m., be questioned again at 3:00 a.m., and give a blood sample, and give a taped statement

(47)



about 5:00 a.m. (R.4,7) The State had the burden to show by a preponderance of the evidence that the consent, if there was any, was voluntarily given. *People v. Casazza*, 144 Ill.2d 414, 417, 581 N.E.2d 651 (1991). The State failed to claim, much less prove, that the defendant consented to wait two hours, relate what he saw, be moved to a different room, and wait for several additional hours. Thus, the State's argument avoided the question of whether the defendant "voluntarily consented" to remain at the police station after he was first questioned by Detective Lullo.      Following the prosecutor's lead, the trial court effectively avoided the issue of whether the police acted improperly by failing to release Mr. Warren after the 2:00 a.m. interrogation. (R.481-82) Judge Hudson carefully recapped the circumstances surrounding the defendant's trip to the police station. The judge then concluded that Mr. Warren was merely a witness when Detective Lullo first questioned him. (R.479-80) The judge observed that "after the initial interview," Detective Lullo noted some "inconsistencies" in the defendant's statement, and saw some blood on the defendant, and some other stains. (R.481)

Although the judge stated that Lullo's problems with the defendant occurred "after the initial interview," the judge failed to consider the important question of exactly when, how, and why Lullo was then still examining and interacting with the defendant. Clearly the defendant's role as a witness was over. Yet Lullo did not release Mr. Warren, he moved him. The court completely ignored this critical part of the events, and went on to discuss the taking of the defendant's clothing, some

forty minutes later.

The judge not only overlooked the critical period from 2:20 to 3:00 a.m., the judge affirmatively failed to consider the police investigation that was then taking place. As discussed above, the police may not detain a suspect while they conduct their investigations and obtain probable cause for the suspect's arrest. See, e.g., *People v. Walls*, 220 Ill.App.3d 564, 579, 581 N.E.2d 264 (1st Dist. 1991).

Judge Hudson cited *People v. Barley*, 273 Ill.App.3d 943, 654 N.E.2d 223, (1st Dist. 1995), for the proposition that the investigatory functions of the police may necessitate station interrogations. (R.652) However, Judge Hudson disregarded the remainder of the Court's holding, which explained that it "has continually rejected the proposed fiction that a person who voluntarily agrees to submit to interrogation at a police station also implicitly consents to remain in the police station while the police investigate the crime to obtain probable cause for the interviewee's arrest." 273 Ill.App.3d at 950. In this case, the police did exactly what was proscribed — while holding him in a locked room inside the police station, they checked Mr. Warren's criminal history and attempted to verify his story with another individual. The police were attempting to obtain probable cause to arrest Warren while they illegally detained him. Furthermore, although police station investigations may be necessary in some circumstances, the State articulated no such necessity in Mr. Warren's case. Lieutenant Copher decided to order Officer Garcia

to bring Warren in, and Garcia did so.

Viewed objectively, the circumstances surrounding Warren's stay in police custody show that any reasonable person would have felt compelled to remain. Indeed, Mr. Warren could hardly do otherwise. Upon his arrival at the station Warren was placed in a room by himself, not allowed to sit in the lobby, or another public waiting area, where one might expect a person who voluntarily comes to a police station for questioning to be placed. *Young*, 206 Ill.App.3d at 800. He saw that the officers used a key when entering the room. Then he was questioned and afterward he was not told that he could leave. The defendant was moved into a different locked room. The circumstances amount to a show of authority sufficient to support Mr. Warren's belief that he was not free to go, and require a finding of an illegal arrest.

Any evidence obtained from the defendant's clothing should have been suppressed because it was obtained pursuant to the illegal arrest. Mr. Warren's blood sample and his statements to the police should also be suppressed, as fruits of the illegal arrest.

A suspect is entitled to *Miranda* warnings when he is subjected to custodial interrogation or is "otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Mr. Warren was thus entitled to *Miranda* warnings before his boots and

clothes were taken from him. Detective Lullo testified that after the evidence technician took Warren's clothes, Lullo read the *Miranda* warnings to him. (R.240)

A court should suppress a defendant's statement where an illegal arrest has occurred and the police obtained the statement by exploiting the illegality of the arrest. *People v. McKinney*, 277 Ill.App.3d 889, 661 N.E.2d 408 (1st Dist. 1996). The burden is on the State to show sufficient attenuation between the illegal arrest and the subsequent confession and/or evidence obtained. *Holveck*, 141 Ill.2d at 97. Several factors that may assist in the determination of whether a statement is obtained in exploitation of an illegal arrest are the temporal proximity of the arrest and the statement, the giving of *Miranda* warnings the presence of intervening circumstances, "and, particularly, the purpose and flagrancy of official misconduct." 141 Ill.2d at 97-98. When these factors are considered, it is clear that the statements made by the defendant should be suppressed because there was no attenuation to purge the primary taint.

The defendant's statement and blood were obtained almost immediately after his clothes were taken, with no intervening circumstances. The purpose and flagrancy of the police misconduct is unmistakable although there was no physical abuse. The police arrogantly assumed they could hold this homeless man as long as they cared to while they conducted their business. With no regard for Mr. Warren's rights, the police brought him to the police station after he, like any good

citizen, reported a crime. According to Detective Lullo, Lieutenant Copher did not bother to tell him that Warren, the only eyewitness to a murder, was inside the police station for over an hour. (R. 219) And Detective Lullo did not bother to tell Mr. Warren that he could leave. Detective Lullo put Warren into a room while he tried to obtain probable cause for Warren's arrest. Lullo, a veteran police officer, must have known his conduct was unlawful.

The United States Supreme Court cited *United States ex rel. Dockley v. Myers*, 450 F.2d 232 (3d Cir. 1971), in *Brown v. Illinois*, 422 U.S. 590, 604, n. 9, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), as an example of flagrant official misconduct. The *Dockley* Court found that the police arrested the defendant on a forgery charge in order to obtain and maintain control over him and facilitate his interrogation regarding two missing persons, subsequently determined to be homicide victims. 450 F.2d at 236. The statements elicited from the defendant were determined to be inadmissible as a direct result of the illegal detention. "If the police are to be deterred from using illegal arrest and detention as a means of obtaining self-incriminating statements, evidence thus obtained must be excluded." 450 F.2d at 237.

In *United States v. Edmons*, 432 F.2d 577 (2d Cir.1970), also cited in *Brown*, F.B.I. agents, who did not know the perpetrators' identity, made "flagrantly illegal arrests" for failure to have selective service cards in the defendants'

possession for the sole purpose of exhibiting those persons before other F.B.I. agents, who had been victims of an assault on the previous night. 432 F.2d at 582. The Court observed that the F.B.I. agents "must have known" their conduct was unlawful. 432 F.2d at 585. The official misconduct in *Edmons*, while not criminal, departed so far from constitutional standards, that "no federal court could simply look the other way." 432 F.2d at 585. The Court observed: "A ruling admitting evidence in a criminal trial * * * has the necessary effect of legitimizing the conduct which produced the evidence," and "Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens." 432 F.2d at 585, citing *Terry v. Ohio*, 392 U.S. at 13.

In this case, the official misconduct is at least as egregious as that in *Dockley* and *Edmons*. The police did not formally arrest the defendant. Nevertheless he no doubt believed he had been arrested. And the sole purpose of detaining Mr. Warren, in fact, the only activity engaged in by the police, was to obtain evidence against him.

The police detectives admitted they were suspicious of Mr. Warren, primarily because of the dirt and stains on his clothes. That was the reason they asked him for his clothes -- the detectives expected to find incriminating evidence on Warren's clothes. And he gave up his clothing because he believed he had to. The police improperly elicited an incriminating response from the suspect when

**(53)**

they obtained his clothes. The sole drop of blood that tentatively linked the defendant to the victim was found on his boots. Therefore, this evidence should have been suppressed because it was obtained during an illegal detention and the taint of the detention was not dissipated by the police actions of continuing to detain the defendant and reading the *Miranda* warnings.

As an alternative to the relief requested above, this Court should reverse the trial court's ruling on the motion to quash arrest and suppress the evidence obtained therefrom, including the defendant's statements. The defendant's conviction should be reversed without remand because without the illegally obtained evidence, the State is unable to prove the defendant guilty beyond a reasonable doubt. *People v. Woods*, 241 Ill.App.3d 285, 290, 608 N.E.2d 1291 (2d Dist. 1993).

D4285 MCC#1

## IV.

JUSTICE REQUIRES THAT PETITIONER"S CONVICTION BE REVERSED BECAUSE
THE JURY"S VERDICT WAS BASED ON INADMISSABLE EVIDENCE--EVIDENCE
THAT WAS OBTAINED ILLEGALLY WHEN THE POLICE HELD THE DEFENDANT
LONG AFTER HE GAVE HIS ACCOUNT OF THE OCCURRENCE HE WITNESSED.....

Detective Lullo admitted that he held the defendant in the
police station after he gave his statement so that Lullo and other
police officers could investigate Warren's story. Lullo admitted
he did not have probable cause, yet he detained the defendant inside
a small,windowless locked room.

The Appellate Court relied on the fact that the police held
Mr. Warren in a room that locked only one-way, but the Court ignored
the fact that the defendant had no way of knowing this. The police
treatment of the defendant is factually indistingushable from the
treatment of the defendant in PEOPLE v. YOUNG,206 ILL. App.3d 789,
564 N.E.2d 1254(1st Dist. 1990), in which the appellate court
determined that the defendant had been illegally detained.

In its opinion in this case, the appellate court considered
that although the police held the defendant, it was only for "a short
period of time." (ship opinion at 9) The Appellate Court fails to
explain how the police were empowered to detain Mr. Warrenfor any
period of time after he reported what he had seen. The record
indicates the defendant reported an attack on a old man near the
Fox River in Elgin shortly before mid-night.(R-156-57). He was told
to remain where he was until a police officer arrived. Warren told
the opfficers what he saw and the officer then drove him to the
policestation, (R-158-59,162),where the police purportedly advised
the defendant of his Airanda rights around 3:00 a.m. During this
three-hour window the police picked up and questioned one of the

defendant's roommates to verify his report.(R-233-35, C-332)

Such an investigation, conducted while holding the defendant, is illegal. It is unimportant whether the police investigation took several hours, several minutes, or several days. The defendant was <u>not free</u> to leave. He was held in the most coercive atmosphere possible, A police station."

Because the police have no authority to hold a witness absent probable cause, the detention, and any evidence obtained therefore was illegal. PEOPLE v YOUNG,206 Ill. App 3d at 800. PEOPLE v. HOLVECK, 141 Ill.2d 84 (1990)


In addition, the evidence tending to suggest the defendant committed the offence was tenuous. The State relied on the biased and unreliable testimony of two jailhouse informants, a speck of blood that belonged <u>neither</u> to the defendant or the victim, and a single fingerprint which the defendant explained he must have placed on a envelope belonging to the victim when he sorted mail at the Wayside Mission, a homeless shelter both men utilized.

If, as the State claimed, the defendant committed the offense, his fingerprints should have been found on <u>all</u> of the victim's papers, as well as on the weapon used in the attack. The State claim this critical evidence of the defendant's culpability must have wash away inthe river where the body was found, but at the same time argued that the drop of blood found on his shoe was presrved. No reasonable person could conclude that Mr. Warren committed this attack and then reported it to police, not knowing whether he was covered in the blood of the victim.

(56)

The evidence was not sufficent to remove all reasonable
doubt of the defendant's guilty, or to create an abiding conviction
that he is guilty of first degree murder. PEOPLE v YOUNG, 128 ILL.2d
1, 48, 538 N.E. 2d 453 (1989).

## ΕV.

**The trial court's denial of Robert Warren's motion to suppress his statements was manifestly erroneous where its decision was based on (1) his asking for a lawyer after he cooperated with the police and relinquished his clothes, blood, and statements, (2) the defendant's courtroom demeanor, and (3) the opinion of a psychiatrist whose field of expertise did not encompass the issue to be decided, namely, the defendant's ability to understand *Miranda* warnings at the time of the interrogation.**

When the trial court ruled that the defendant's statements were admissible, the only objective evidence of Robert Warren's level of comprehension and knowledge at the relevant time, were the reports and testimony of Dr. Beth Tipton, a clinical psychologist employed by the Kane County Diagnostic Center. (R.305-93) Dr. Tipton's complete report, titled "Comprehension of *Miranda* Rights Evaluation" is a subject of a motion to supplement the record filed together with this Brief. Although Dr. Tipton did not examine the defendant until March 26, 1996, hers is the only evidence of the defendant's knowledge and understanding at any time even close to the relevant date of May 30, 1995. In her evaluation, Dr. Tipton concluded that even ten months later, the defendant was confused about the *Miranda* rights and thus did not knowingly and intelligently waive his rights at the time of the interrogation. (R.336-38) Warren could not have validly waived the *Miranda* rights primarily because of his extremely poor language comprehension skills and because he "goes along" and was incapable to stopping the interrogation. (R.338) The trial court therefore erred in denying the motion to suppress where the

manifest weight of the evidence proved the statements could not have been voluntarily made.

Generally, the standard of review of a trial court's finding on a motion to suppress a defendant's statement is whether the finding is contrary to the manifest weight of the evidence. A trial court's finding must be overturned when it is against the manifest weight of the evidence. *People v. Oaks*, 169 Ill.2d 409, 447, 662 N.E.2d 1328 (1996).

Dr. Tipton's education and experience qualified her to conduct psychological tests and interpret the data obtained therefrom. (R.391, 519) She had conducted about 165 psychological assessments. (R.1837) In addition, Dr. Tipton reviewed her test data with her supervisor, Dr. Brown, and with a lawyer/psychologist, Dr. Ostroff. (R.332-33) The conclusion she and her colleagues drew was that the defendant was unable to knowingly and intelligently waive his rights in May 1995. (R.328, 337, 338, 344)

In May 1996, Dr. Tipton issued her evaluation of the defendant's lack of understanding of the *Miranda* warnings along with her report that the defendant was unfit to stand trial because he was distrustful of his attorney and he was unaware of courtroom procedure and the roles of various personnel. (C.50; R.338) Dr. Tipton later met with Mr. Warren on two occasions. (R.338) He was unhappy with her assertion that he was unfit for trial, and in August 1996, Warren told her

(59)



that he had been reading lawbooks while in the jail and demonstrated to her that he had become fit for trial. (R.339-40, 389-90) The defendant's reaction reinforced Dr. Tipton's belief that Mr. Warren had not been malingering.

The State attempted to rebut Dr. Tipton's opinion with the opinion of Dr. Frank Johnson. (R.500-49) Dr. Johnson's written report of his findings dated October 16, 1996, is included in a motion to supplement the record filed together with this Brief. Not only was Dr. Johnson's report inadequate to refute Dr. Tipton's conclusion, his opinions were outside his area of expertise and were not admissible on that basis alone. Dr. Johnson was a medical doctor who specialized in psychiatry. (R.501-2, 505)

First, Dr. Johnson should not have been permitted to testify as an expert witness because an expert should be permitted to testify if his experience and qualifications afford him knowledge not commonly held by lay persons, and if his testimony will aid the factfinder. *People v. Novak*, 163 Ill.2d 93, 104, 643 N.E.2d 762 (1994). Expert testimony is only necessary when the subject is both particularly within the witness' experience and qualifications and beyond that of the factfinder's, and when it will aid the factfinder in reaching its conclusion. *People v. Enis*, 139 Ill.2d 264, 288, 564 N.E.2d 1155 (1990).

A threshold requirement for the introduction of expert testimony is that the testimony will aid the trier of fact in reaching its conclusions. *People v. Childress*,

158 Ill.2d 275, 296, 633 N.E.2d 635 (1994). Expert testimony should be allowed only if (1) the proffered expert has knowledge and qualifications uncommon to laypersons that distinguish him as an expert; (2) the expert's testimony would help the trier of fact understand an aspect of the evidence that it otherwise might not understand, without invading the province of the trier of fact to determine credibility and assess the facts of the case; and (3) the expert's testimony would reflect generally accepted scientific or technical principles. *People v. Simpkins*, 297 Ill. App.3d 668, 681, 697 N.E.2d 302 (4th Dist. 1998), citing *Enis*, 139 Ill.2d at 288.

In *Wade v. City of Chicago Heights*, 295 Ill.App.3d 873, 693 N.E.2d 426 (1st Dist. 1998), the Appellate Court listed factors the courts consider in determining when an expert opinion would aid a factfinder's understanding of the facts: the complexity of the subject involved, the purpose for which the opinion is offered, its relation to the ultimate issue to be determined, and the danger of undue prejudice. 295 Ill.App.3d at 882. The Court also observed that the "trend is to permit expert testimony in matters that are complicated and outside the knowledge and understanding of the average person," and it is "proper if the evidence offers knowledge and application of principles of science beyond the ken of the average juror." 295 Ill.App.3d at 882.

Dr. Johnson had special knowledge and training in psychiatry, but he did not



use it in this case to aid the factfinder. By his own words, Dr. Johnson acted as a layperson who was no more qualified to opine about the defendant's knowledge of *Miranda* rights when he was interrogated than the average citizen. The court gained nothing but prejudicial and irrelevant impressions from Dr. Johnson's "expert opinion." This is analogous to allowing a public defender to give expert testimony on patent law. Being an expert in one field is no cause for expressing an expert opinion in another. The public defender would doubtless be able to acquire some knowledge in the area of patents, but would be unqualified to give an expert opinion of any real value to the court.

The Supreme Court cautioned against the overuse of expert testimony in *People v. Enis*, 139 Ill.2d 264, 564 N.E.2d 1155 (1990), noting that so-called experts can usually be obtained to support almost any position. 139 Ill.2d at 289. In *Enis*, the Court determined that in a particular case, a jury might inappropriately conclude, based on expert testimony, that all eyewitness testimony is unreliable. 139 Ill.2d at 290. The *Enis* Court upheld the trial court's decision to bar the expert witness, noting that a trial judge is given broad discretion when determining the admissibility of an expert witness, and in the exercise of its discretion, the trial court should also carefully consider the necessity and relevance of the expert testimony in light of the facts in the case before it. 139 Ill.2d at 290.

The trial court abused its discretion in admitting and relying on Dr.



Johnson's testimony because it proved to be irrelevant to the issue. Furthermore, Dr. Johnson appears to be one of the so-called experts that can usually be obtained to support most any position.

In addition to determining that Warren understood the *Miranda* warnings, Dr. Johnson also declared that the defendant was not suffering from any active, major mental illness or any kind of psychiatric problem. (R.510, 514) Dr. Johnson's opinion is unsupported by the defendant's psychiatric records. The portions of the defendant's psychiatric records that are included in the common law record take up over 500 pages. (C.433-937) Warren's psychiatric problems started when he was five years old, (C.795), and continued over the years, with a several diagnoses and treatment with a variety of psychotropic medications. Warren had been hospitalized for his mental health problems more than 20 times. (C.435) As the Supreme Court stated in *Enis*, "The determination of a lawsuit should not depend upon which side can present the most or the most convincing expert witnesses." 139 Ill.2d at 289. But that is what happened here. The trial judge stated that he relied on the psychiatrist's testimony "within a reasonable degree of psychiatric certainty" that the defendant understood and waived his constitutional rights while concurrently asserting that his own in-court observations showed him the identical information. (R.660-62)

The court may not have needed any expert assistance to answer the question

of whether the defendant knowingly and intelligently waived his rights, as the court itself observed. (R.313-14) Still, the court admitted the experts' testimony and relied heavily on Dr. Johnson's opinion when it ruled that the defendant understood and waived his rights. (R.660-63)

As the factfinder in pretrial hearings, the trial court must resolve any conflicts in the testimony by making a credibility determination. *People v. Brown*, 169 Ill.2d 132, 147, 661 N.E.2d 287 (1996). However, there were no significant conflicts in the testimony here because, unlike Dr. Tipton, Dr. Johnson made no attempt to discover whether the defendant understood the *Miranda* warnings at the time he was interrogated by the police. Dr. Johnson only asked the defendant if he understood the *Miranda* warnings on October 4, 1997, more than two years too late. At that time the defendant responded affirmatively. This question and answer does not address and therefore can not answer the question of whether the defendant understood his rights at the time they were given. Dr. Johnson's questions brought out the fact that the defendant had studied and educated himself about the courts and the law while he was incarcerated, but had no bearing on the relevant question of whether the defendant knowingly and voluntarily waived his rights. His opinion was irrelevant and should not have been admitted.

Dr. Johnson determined that the defendant understood the *Miranda* warnings as follows: On October 4, 1996, "I simply read the rights to him, and he indicated

that he understood the meaning of the rights.  These are simple statements."
(R.510)  But, as a psychiatrist, Dr. Johnson lacked the necessary education and
training to assist in the determination of whether the defendant knowingly and
intelligently waived his rights on May 30, 1995.  Dr. Johnson only talked to the
defendant briefly.   In addition, he was not qualified to test, or interpret
psychological test data.  (R.519)  He admitted basing his belief that the police
*Mirandized* Mr. Warren solely on the police reports.  (R.513-14, 534)  He twice
stated that he had "faith" in them.  (R.534, 546)  Obviously, the court could have,
and likely had, read those reports itself.

When asked how he formed his opinion that the defendant knowingly and
voluntarily waived and then asserted his constitutional rights, Dr. Johnson testified
that he relied on the police report.  (R.513, 514)  He did not consider the reports
of the psychologists.  (R.519)  And he did not ask Mr. Warren how much he knew
about the law before he was incarcerated.  (R.518)  Still, in Dr. Johnson's opinion,
two years earlier the defendant intelligently and knowingly and voluntarily waived
his rights, based on the single act of refusing to continue a police interrogation that
had already gone on for hours.  (R.513)  Dr. Johnson, as a general psychiatrist, had
no special skills to enable him to develop such an opinion.

A psychiatrist is by definition a medical doctor who specializes in mental,
emotional, and behavioral disorders.  (R.501) *The Merriam Webster Dictionary*

(65)

(1995) at 419. Dr. Johnson therefore had no specialized abilities to help the court
determine whether in May 1995, the defendant understood and knowingly waived
his constitutional rights. Dr. Johnson admitted that he lacked the specialized ability
to aid in a resolution of the issue when he testified that his opinion was based on the
police reports he had read:

> Dr. Johnson:    My opinion is he did give a knowing
> and voluntary waiving of his rights.
>
> Prosecutor:    And what do you base that opinion upon,
> Doctor?
>
> Dr. Johnson:    It's right in the [police] record. He said, I
> don't want to talk anymore. Bring me
> my lawyer. I want a lawyer.    Something to
> that effect. That's exercising your rights.

(R.513)    Dr. Johnson added, "How else can you do it?"    In sum, all that Dr.
Johnson's questions accomplished was to confirm that the defendant had become a
student of the court system and the law since his incarceration.

Dr. Johnson's first meeting with the defendant took place in July 1996, for
the limited purpose of assisting in determining his fitness to stand trial. Dr.
Johnson interviewed Warren to determine his ability to understand his rights on
October 4, 1996, more than 16 months after the police interrogation, and after the
defendant had thoroughly studied the *Miranda* warnings. Dr. Johnson did not even
ask the defendant if he knew those rights on the relevant date. (R.518)

In this case, the Dr. Tipton's testimony shows that the defendant's

intellectual capacity interfered with his ability to comprehend the *Miranda* warnings. Just as in *Bernasco*, a psychologist tested the defendant and learned that he had an inadequate understanding of the language typically used in the *Miranda* warnings. In this case, however, Dr. Tipton was not a school psychologist, but a clinical psychologist who tested the defendant using special tests for the specific purpose of determine understanding of the *Miranda* warnings. Specific examples were read to the court, such as the defendant's defining "appoint" as "somebody's gonna do something for you," and "consult" as "talk, like I'm doing to you." (R.364-65)

As a result of the defendant's scores on the tests she administered, along with other data, Dr. Tipton concluded that Robert Warren did not knowingly and intelligently waive his rights. (R.336-37) Her expert opinion was based in part on the fact that the rights were spoken and not presented to the defendant in written form. (R.337) Yet, Judge Hudson concluded otherwise, because he relied on Mr. Warren's conduct in the courtroom during the suppression hearings; on his asking for an attorney after being held for more than six hours after he was brought back from the hospital where a sample of his blood had been taken; and on a psychiatrist's "expert" opinion, that he knew and understood his rights. The trial court erred in finding a knowing and intelligent waiver.

A person who does not understand English should not be found to have

(67)

knowingly and intelligently waived constitutional rights read to him in English simply because he managed to learn English two years later and was able to demonstrate his proficiency in English to the court. The situation is the same here. Robert Warren, with hard work and persistence, learned about the law after his arrest. By the time he testified before Judge Hudson on June 27, 1997, he ably demonstrated his newly-acquired knowledge. In effect, when the judge denied the motion to suppress, he penalized Mr. Warren for his scholarship. This result is unjust and contrary to the law.

To be valid, a waiver "must reflect an intentional relinquishment or abandonment of a known right or privilege. The accused must possess a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *In re W.C.*, 167 Ill.2d 307, 328, 657 N.E.2d 908 (1995), citing *People v. Bernasco*, 138 Ill.2d 349, 360, 562 N.E.2d 958 (1990). The defendant must be cognizant at all times of "the State's intention to use [one's] statements to secure a conviction" and of the fact that one can "stand mute and request a lawyer." *Bernasco*, 138 Ill.2d at 360. "If intelligent knowledge in the *Miranda* context means anything, it means the ability to understand the very words used in the warnings." *Bernasco*, 138 Ill.2d at 363. Where the record shows that a defendant's intellectual capacity <u>did</u> interfere with his ability to comprehend the *Miranda* warnings, the defendant's statements should be suppressed. *People v.*



*Sneed*, 274 Ill. App.3d 274, 281, 653 N.E.2d 1340 (1st Dist. 1995).

In ruling on the defendant's motions, Judge Hudson declared that he was following the precepts of *People v. Baker*, 9 Ill.App.3d 654, 292 N.E.2d 760 (4th Dist. 1973), in which the Appellate Court held that courts must "look to the age of the suspect, his familiarity with English, the mental capacity of the suspect, including his intelligence, his background, his education." (R.658); 9 Ill.App.3d at 659. However, additionally, a court is required to objectively determine whether in the circumstances of the case the words used were sufficient to convey the required warning. *People v. Reid*, 136 Ill.2d 27, 55, 554 N.E.2d 174 (1990). In this case, Detective Lullo testified that the only *Miranda* warning that he explained to the defendant was the right to counsel. (R.280) The State was unable to inform the trial court of the exact words used because Lullo testified that he could not recall what he said. (R.277) Therefore, it was impossible for the court to fairly decide that the unknown words were sufficient to convey the required warnings to this defendant.

Judge Hudson believed that the most compelling evidence of whether a person understands the *Miranda* warnings is whether the person is able to and chooses to exercise those rights. (R.662-63) The court indicated that it relied primarily on the defendant's purported initial waiver and his subsequent refusal to continue to find that the defendant understood his constitutional rights at the police

interrogation. The trial court's circular reasoning that the defendant knew he had certain rights because he waived them and later asserted one of those rights was improper and legally insufficient.

Because Mr. Warren reported an incident to the police, he was questioned for hours, and his clothes and blood were taken. Eventually, after cooperating for more than six hours, Robert Warren had had enough and he wanted to be allowed to leave. Refusing to continue to cooperate with the police did not prove that he knew and understood his rights under *Miranda*. Rather, whether a defendant knowingly, intelligently, and voluntarily waived his right to remain silent and his right to counsel depends on the particular facts and circumstances of the case, including the defendant's age, education, conduct, and intelligence, the duration of the questioning, and whether he received his constitutional rights or was subjected to any physical punishment. *Oaks*, 169 Ill.2d at 447; *W.C.*, 167 Ill.2d at 328.

Also, the mental capacity of a defendant must be taken into consideration in determining whether a waiver was valid, and while mental deficiency, of itself, does not render a statement unintelligent, it is nonetheless a factor which must be considered in the totality of the circumstances under which the right to counsel was waived or a statement or confession given. *W.C.*, 167 Ill.2d at 328. "The mental state that is necessary to validly waive *Miranda* rights involves being cognizant at all times of the State's intention to use one's statements to secure a conviction and

of the fact that one can stand mute and request a lawyer." *W.C.*, 167 Ill.2d at 328, citing *People v. Bernasco*, 138 Ill. 2d 349, 360, 562 N.E.2d 958 (1990).

Here, the totality of the circumstances on May 30, 1995, shows the waiver was not made intelligently and knowingly. First, the defendant's low mental capacity, in the lower 25 percent of the population, is critical evidence that he was not acting intelligently and voluntarily. (R.358) In addition, Mr. Warren had extremely poor language comprehension skills, rendering him unable to interpret the words that he heard. (R.334, 345) "If intelligent knowledge in the *Miranda* context means anything, it means the ability to understand the very words used in the warnings." *W.C.*, 167 Ill.2d at 334, citing *Bernasco*, 138 Ill.2d at 363. "If one lacks that ability, the repetition of the advice even accompanied by a statement of agreement indicates very little." *W.C.*, 167 Ill.2d at 334, citing *People v. Turner*, 56 Ill.2d 201, 306 N.E.2d 27 (1973).

The trial court's findings regarding the defendant's waiver of rights was manifestly erroneous in light of the evidence at hand. Therefore, as an alternative to the relief required elsewhere in this brief, this Court should vacate the order denying his motion to suppress and remand the cause for further proceedings with directions that his police statement be suppressed.

## CONCLUSION

The defendant, Robert Warren, respectfully requests that this Honorable Court, in the alternative:

1. Reverse his conviction; or

2. Reverse his conviction and remand the case for a new trial.

Respectfully submitted,

Robert A. Warren.

*Robert Warren*

Robert A Warren Defendant-Appellant.

Reg # B50436

Menard Correctional Center

P.O. Box 711

Menard, Illinois. 62259-0711

(72)

## IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT

### KANE COUNTY, ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) |
| | ) |
| Respondent, | ) |
| | ) |
| -vs- | ) General No. 95 CF 1275 |
| | ) |
| ROBERT A. WARREN, | ) |
| | ) |
| Petitioner. | ) |

## PRO SE PETITION FOR POST-CONVICTION RELIEF

The petitioner, Robert A. Warren, *pro se*, respectfully moves this Honorable Court pursuant to § 122-1 *et seq.* of the Code of Criminal Procedure, 725 ILCS 5/122-1 *et seq.* (1999), to vacate the judgment entered on November 12, 1998, in the Kane County Circuit Court, on the finding of guilty of first degree murder, and sentence of 52 years imprisonment, and to grant him a new trial.

IN SUPPORT THEREOF, the petitioner states as follows:

1. The petitioner, Robert A. Warren, was charged by an indictment filed on July 11, 1995 with one count of first degree murder, 720 ILCS 5/9-1 (1995).

2. At the conclusion of a jury trial held in Kane County in August 1998, Judge Donald Hudson presiding, a guilty verdict was returned.

3. On November 12, 1998 following the denial of the petitioner's motion for a new trial, a sentencing hearing proceeded. The petitioner was sentenced to 52 years imprisonment.

4. The petitioner filed a direct appeal with the Appellate Court, Second Judicial District. The issues raised in that appeal were: the prosecution failed to prove him guilty beyond a reasonable

EX. E

doubt; the court erroneously allowed impeachment of the defendant with the mere fact method; the defendant's statement and evidence against him were the product of an unreasonable search and seizure; the defendant did not validly waive his rights to silence and counsel. The Appellate Court affirmed the conviction and sentence. *People v. Warren*, No. 2-98-1510 (2d Dist., Jul. 20, 2000) unpublished order (copy appended to this Petition). The petitioner filed a *pro se* petition for rehearing which the Appellate Court denied on August 7, 2000.

5. A Petition for Leave to Appeal the aforesaid decision was timely filed by the petitioner by mailing it from Menard Correction Center on August 31, 2000. The Illinois Supreme Court has not yet ruled on the petition.

6. This petition is being timely filed within three years of the date of conviction or six months of the denial of the petition for leave to appeal by the Illinois Supreme Court, as required by 725 ILCS 5/122-1 (2000).

7. The petitioner is currently serving the 52-year prison sentence in the Menard Correctional Center.

8.    The Petitioner contends, as supported by his attached affidavit, that he was denied his rights under the United States and Illinois Constitutions, and such denials are not reflected on the record of the appeal of his conviction.

Petitioner contends he was denied his right to due process under the United States Constitution and the Illinois Constitution in that the State knowingly used false testimony to obtain his conviction. During the Petitioner's trial, on August 26, 1998, Casey Swindle testified that the Petitioner talked to him about his case while both were in the Kane County Jail. Swindle's testimony was that the Petitioner admitted committing the murder, although, in fact, the Petitioner has consistently maintained his innocence. Swindle testified he had made an agreement with the State's

Attorney's Office that in exchange for his testimony he would receive a three year prison sentence for burglary. (See highlighted portion of page 14 of the Appellate Court decision, Ex. A) Swindle was accused of burglary and theft to a vehicle, he claimed at trial. However, the Petitioner has recently learned that in addition to the charges Swindle admitted to, he was in custody since July 25, 1998, and thus at the time of the Petitioner's trial, on a charge of receiving or possessing or selling a stolen vehicle. (Case Number 98 CF 1436) Swindle was sentenced for a four-year term of imprisonment for this offense in addition to the three years on the burglary charge. (Ex. B) Swindle did not reveal this part of his criminal record during his testimony.

Swindle was a critical witness against the Petitioner, there being no eyewitness testimony or direct evidence of the Petitioner's culpability. Because this witness did not completely relate his criminal background, the jury could not have properly and completely assessed his credibility.

The State was aware of the facts withheld by Swindle, but the prosecutor did nothing to correct Swindle during the Petitioner's trial. This newly-discovered evidence of the State's key witness' bias and failure to testify truthfully, denied the Petitioner his constitutional right to a fair trial. Furthermore, the State's failure to correct the misinformation denied the Petitioner his constitutional right to due process.

9. Because of the aforementioned substantial denial of the Petitioner's constitutional rights, the judgment and sentence of conviction should be vacated and set aside and a new trial should be ordered.

10. The Petitioner additionally requests that he be granted leave to amend this petition and to supplement it with additional affidavits upon further investigation.

## CONCLUSION

THEREFORE, for the above reasons, Robert A. Warren, the petitioner, respectfully prays

that this Honorable Court will vacate the judgment entered in this cause on November 12, 1998, and

grant him a new trial.

Respectfully submitted,

Robert A. Warren

Robert A. Warren
Reg. No. B50436
Menard Correctional Center
P. O. Box 711
Menard, Illinois  60432

STATE OF ILLINOIS          )
                           ) SS
COUNTY OF RANDOLPH         )

## AFFIDAVIT

Robert A. Warren, the petitioner, being first duly sworn, states that he has read the foregoing

document, and the matters stated therein are true, correct and complete to the best of his knowledge.

Robert A. Warren

Robert A. Warren

Subscribed and Sworn to
before me this ___ day
of _____, 2000.

Notary Public

"OFFICIAL SEAL"
MARY L. WEST
Notary Public, State of Illinois
My Commission Expires 4-28-2001

IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT

KANE COUNTY, ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) |
| | ) |
| Respondent, | ) |
| | ) |
| -vs- | ) General No. 95 CF 1275 |
| | ) |
| ROBERT A. WARREN, | ) |
| | ) |
| Petitioner. | ) |

0 3 2000

## MOTION FOR APPOINTMENT OF COUNSEL

Robert A. Warren, the petitioner, respectfully requests this Honorable Court, pursuant to 725

ILCS 5/122-4 (1999), to appoint counsel to represent the petitioner in the proceedings relating to his

petition for post-conviction relief.

IN SUPPORT THEREOF, it is alleged that:

1. The petitioner presently stands convicted of the offense of first degree murder and

sentenced to a 52-year term of imprisonment.

2. The petitioner, a resident at the Menard Correctional Center, is now without financial

means with which to procure counsel. An affidavit of assets and liabilities is attached.

3. The petitioner was represented at trial and on appeal by court-appointed counsel.

Robert A. Warren

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) SS |
| COUNTY OF RANDOLPH | ) |

Robert A. Warren

Robert A. Warren, the petitioner, being first duly sworn, states that he has read the foregoing
document, and the matters stated therein are true, correct and complete to the best of his knowledge.

Robert A. Warren

Robert A. Warren

Subscribed and Sworn to
before me this _26_ day
of _Sept_, 2000.

Notary Public

"OFFICIAL SEAL"
MARY L. WEST
Notary Public, State of Illinois
My Commission Expires 4-28-..00,

IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT

KANE COUNTY, ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ) | |
| ) | |
| Respondent, ) | |
| ) | |
| -vs- ) | General No. 95 CF 1275 |
| ) | |
| ROBERT A. WARREN, ) | |
| ) | |
| Petitioner. ) | |

## AFFIDAVIT OF ASSETS AND LIABILITIES

I, *Robert A. Warren*, petitioner in this case, on oath state that I am without adequate assets to retain counsel, and that I make the following statement in support of my request to be represented by court-appointed counsel.

1. Name  *ROBERT ANTHONY WARREN*

2. Date of Birth  *JUNE 25, 1969*

3. Address  *P.O. BOX 711 MENARD, ILLINOIS 62259*

4. Telephone  *U-K*

5. Family:
   a) Marital Status  *SINGLE*
   b) Number of Children  *NONE*
   c) Number of other Dependents  *NONE*  and relationship:
   *NONE*

6. Name and address of current employer  *NONE*

   Length of employment _____

   Occupation  *NONE*

7. Earnings and sources of income:
   a) $ *15.00*  per month from employment  *LABOR POOL - STATE PAY*
   b) $_____  per month from pension, trusts, annuity, welfare,
   Workman's Compensation, retirement or disability plan, or any
   similar State, Federal, local, or private benefit plan.

c) $ _—.0—_ per month from rents, royalties, bonds, securities, or interest.

d) $ _—0—_ per month from other sources enumerated herein ___

e) $ _15.00_ per month from all sources.

8. Value of Assets:

a) Home or other dwelling $ _—0—_.

b) Other real property $ _—0—_. Where situated _____

c) Car $ _NONE_ Make _NONE_ Year _NONE_

d) Other personal property (jewelry, household contents, furs, etc.) $ _-0-_

e) Bank accounts $ _—0—_

f) Cash on hand $ _—0—_

g) Surrender value of life or annuity insurance policies $ _—0—_

h) Securities, trusts, bonds $ _—0—_

I) Other assets $ _—0—_ Described herein _____

j) Total value of assets $ _—0—_

9. Liabilities:

a) Mortgage on home $ _—0—_ Monthly Payment $ _—0—_

b) Amount owed on car $ _—0—_

c) Personal debts $ _15.00_ To whom owed _IDOC_

d) Other debts $_____ To whom owed _____

e) Total liabilities and debts $_____

10. If released on bail, specify amount of security $ _—0—_
and source of payment of security (defendant's funds, borrowed cash, etc.)___

_____

I CERTIFY THE FOREGOING IS TRUE TO THE BEST OF MY
KNOWLEDGE AND BELIEF.

_Robert A. Warner_

Subscribed and sworn to
before me this _26_ day
of _Sept_, 2000.

_Mary Lw_
Notary Public

```
"OFFICIAL SEAL"
MARY L. WEST
Notary Public, State of Illinois
My Commission Expires 4-28-2001
```

## APPENDIX

### List of Exhibits

A. *People v. Warren*, No. 2-99-1510 (2d Dist., Jul.20, 2000) unpublished order

B. D.O.C. record for Casey Swindle

# ILLINOIS CORRECTIONS
### DEPARTMENT OF

George H. Ryan, Governor
Donald N. Snyder, Jr., Director

| administration | inmate search | facilities | IDOC news | director |
|---|---|---|---|---|
| reports & stats | jobs @ IDOC | interactive | industries | victim services |

## K63502 - SWINDLE, CASEY

**Parent Institution:** Southwestern Correctional Center
**Inmate Status:** PAROLE
**Location:** INTERSTATE COMPACT
**Discharge Reason:**

| **Date of Birth:** | 03-10-1976 | **Weight:** | 210 lbs. | **Hair:** | Brown |
|---|---|---|---|---|---|
| **Sex:** | Male | **Height:** | 5 ft. 11 in. | | |
| **Race:** | White | **Eyes:** | Hazel | | |

### Marks, Scars, & Tattoos

TATTOO, ARM, RIGHT - CROSS

TATTOO, ARM, LEFT - 2 CROSS, HEART ON KNUCKLES

TATTOO, ANKLE, LEFT - BART SIMPSON

TATTOO, HAND, LEFT - CASEY CJ HEART

### Admission / Release / Discharge Information

| **Custody Date:** | 03/18/1998 | | |
|---|---|---|---|
| **Projected Parole Date:** | | **Paroled Date:** | 10-01-1999 |
| **Tentative Discharge Date:** | | **Discharge From Parole:** | 10/03/2001 |

### Sentencing Information

| Mittimus | Class | Count | Offense | Custody Date | Sentence | County |
|---|---|---|---|---|---|---|
| 98CF1436 | 2 | 1 | RECEIVE/POSS/SELL STOLEN VEH | 07/25/1998 | 4 yrs 0 mths 0 days | KANE |
| * 96CF1011 | 2 | 1 | BURGLARY | 06/27/1996 | 3 yrs 0 mths 0 days | KANE |

* Sentence Discharged.

**All complaints regarding the accuracy of information contained in these documents should be submitted, in writing, to the Illinois Department of Corrections, P.O. Box 19277, Springfield, IL 62794-9722.**

Another
Search



OCT 03 2000

*Ex. B*

9/21/00

IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT

KANE COUNTY, ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) |
| | ) |
| Respondent, | ) |
| | ) |
| -vs- | ) General No. 95 CF 1275 |
| | ) |
| ROBERT A. WARREN, | ) |
| | ) |
| Petitioner. | ) |

## ORDER

It appearing to the Court that the above-named petitioner desires to petition this Court for relief from the judgment entered on November 12, 1998, and that he is indigent and requests the appointment of counsel,

IT IS THEREFORE ORDERED THAT:

is hereby appointed to represent the above-named petitioner for purposes of the petition for post-conviction relief.

_____
Judge

_____
Date

IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT
KANE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS, )
        RESPONDENT,      )
                       )

Vs.                 )  NO. 95-CF-1275
                       )

ROBERT A. WARREN,    )
        PETITIONER.    )

## NOTICE AND PROOF OF SERVICE

TO: CLERK OF THE CIRCUIT COURT, JUDICIAL CENTER,
    37 W. 777 ROUTE 38, ST. CHARLES, ILLINOIS 60175

    KANE COUNTY STATE'S ATTORNEY,
    37 W. 777 ROUTE 38, ST. CHARLES, ILLINOIS 60175

ROBERT A. WARREN, THE PETITIONER, HEREBY CERTIFIES THAT ON November 17, 2000, HE FILED AN ORIGINAL AND ONE COPY OF A SUPPLEMETAL PRO SE PETITION FOR POST-CONVICTION RELIEF WITH THE CLERK OF KANE COUNTY, AND MAILED ONE COPY TO THE KANE COUNTY STATE'S ATTORNEY IN ENVELOPES DEPOSITED IN THE U.S. MAIL IN THE MENARD CORRECTIONAL CENTER, ILLINOIS, WITH POSTAGE FULLY PAID AND ADDRESSED AS

INDICATED ABOVE.

Robert A Warren

ROBERT A. WARREN

REG NO. B.50436

MENARD CORR. CENTER

P.O. BOX 711

MENARD, ILLINOIS
                                62259

SUBSCRIBED AND SWORN TO

BEFORE ME THIS 22nd DAY

OF October, 2000.


Jeannine Kohlmeyer

NOTARY PUBLIC

"OFFICIAL SEAL"
Jeannine Kohlmeyer
Notary Public, State of Illinois
My Commission Exp. 03/20/2006

IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT
KANE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS, )
       RESPONDENT, )
                    )

    VS.                   ) GEN NO. 95-CF-1275
                    )

ROBERT A. WARREN,       )
      PETITIONER.      )

SUPPLEMENTAL PRO-SE PETITION
FOR POST-CONVICTION RELIEF

NOW COMES ROBERT A. WARREN, PETITIONER, PRO SE, RESPECTFULLY MOVES ~~THE~~ THIS HONORABLE COURT PURSUANT TO § 122-1 ET SEQ. OF THE CODE OF CRIMINAL PROCEDURE, 725 ILCS 5/122-1 ET SEQ. (1999), ~~FOR~~ THIS SUPPLEMENTAL PRO-SE PETITION FOR POST-CONVICTION RELIEF, TO VACATE THE JUDGEMENT ENTERED ON NOVEMBER 12, 1998, IN THE KANE COUNTY CIRCUIT COURT, ON THE FINDING OF GUILTY OF FIRST DEGREE MURDER, AND SENTENCE OF 52 YEARS IMPRISONMENT, AND GRANT HIM A NEW TRIAL.

IN SUPPORT THEREOF, THE PETITIONER STATES AS FOLLOWS:

EX. F

1. THE PETITIONER, ROBERT A. WARREN, WAS CHARGED BY AN INDICTMENT FILED ON JULY 11, 1995 WITH ONE COUNT OF FIRST DEGREE MURDER, 720 ILCS 5/9-1 (1995).

2. AT THE CONCLUSION OF A JURY TRIAL HELD IN KANE COUNTY IN AUGUST 1998, JUDGE DONALD HUDSON PRESIDING, A GUILTY VERDICT WAS RETURNED.

3. ON NOVEMBER 12, 1998 FOLLOWING THE DENIAL OF THE PETITIONER'S MOTION FOR A NEW TRIAL, A SENTENCING HEARING PROCEEDED. THE PETITIONER WAS SENTENCED TO 52 YEARS IMPRISONMENT.

4. THE PETITIONER FILED A DIRECT APPEAL WITH THE APPELLATE COURT, SECOND JUDICIAL DISTRICT. THE ISSUES RAISED IN THAT APPEAL WERE: THE PROSECUTION FAILED TO PROVE HIM GUILTY BEYOND A REASONABLE DOUBT; THE COURT ERRONEOUSLY ALLOWED IMPEACHMENT OF THE DEFENDANT WITH THE MERE FACT METHOD; THE DEFENDANT'S STATEMENTS AND EVIDENCE AGAINST HIM WERE THE PRODUCT OF AN UNREASONABLE SEARCH AND SEIZURE; THE DEFENDANT DID NOT VALIDLY WAIVE HIS RIGHTS TO SILENCE AND COUNSEL. THE APPELLATE COURT AFFIRMED THE CONVICTION AND SENTENCE. PEOPLE VS. WARREN, NO. 2-98-1510 (2d DIST., JULY 20, 2000) UNPUBLISHED ORDER (COPY ATTACHED TO ORIGINAL PETITION). THE PETITIONER FILED A PRO-SE PETITION FOR REHEARING WHICH THE APPELLATE COURT DENIED ON AUGUST 7, 2000.

5. A PETITION FOR LEAVE TO APPEAL THE AFORSAID DECISION WAS TIMELY FILED BY THE PETITIONER BY MAILING IT FROM MENARD CORR. CENTER ON AUGUST 31, 2000. THE ILLINOIS SUPREME COURT HAS NOT YET RULED ON THE PETITION.

6. THIS SUPPLEMENTAL PETITION IS BEING FILED WITHIN THREE YEARS OF THE DATE OF CONVICTION OR SIX MONTHS OF THE DENIAL OF THE PETITION FOR LEAVE TO APPEAL BY THE ILLINOIS SUPREME COURT, AS REQUIRED BY 725 ILCS 5/122-1 (2000).

7. THE PETITIONER IS CURRENTLY SERVING THE 52 YEAR PRISON SENTENCE IN MENARD CORR. CENTER.

8. THE PETITIONER CONTENDS, AS SUPPORTED BY HIS ATTACHED AFFIDAVIT, THAT HE WAS DENIED HIS RIGHTS UNDER THE UNITED STATES AND ILLINOIS CONSTITUTIONS, AND SUCH DENIALS ARE NOT REFLECTED ON THE RECORD OF THE APPEAL OF HIS CONVICTION.

PETITIONER CONTENDS HE WAS DENIED HIS RIGHT TO A FAIR TRIAL UNDER THE UNITED STATES CONSTITUTION AND THE ILLINOIS CONSTITUTION IN THAT THE PETITIONER WAS CONVICTED UNLAWFULLY FOR THE OFFENSE OF FIRST DEGREE MURDER AND THEN WAS SENTENCED TO A TERM OF 52 YEARS IMPRISONMENT

AND THAT THE INDICTMENT FILED ON JULY 11, 1995, CONSISTED THAT THE PETITIONER CAUSED THE DEATH ( AND DID GREAT BODILY HARM AND KNOWING SUCH ACTS CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY HARM TO MR. GEORGE ROBOTHAM. ( SEE ORIGINAL FILED COPY OF INDICTMENT EX. A ) HOWEVER, THE PETITIONER HAS RECENTLY LEARNED THAT THE JUDGEMENT ENTERED ON NOVEMBER 12, 1998 IS IN CONFLICT WITH THE INDICTMENT FILED ON JULY 11, 1995. ( SEE UNDERLINEDED PORTION EX. B )

THE HONORABLE HUDSON, WAS FULLY AWARE WHEN A VERDICT OF GUILTY RETURNED BUT DID NOTHING TO CORRECT THE JUDGEMENT NOT WITH STANDING THE VERTICT. THIS NEWLY-DISCOVERED EVIDENCE OF THE JUDGE'S MIS CONDUCT, DENIED THE PETITIONER HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL. FURTHERMORE, THE JUDGE'S FAILURE TO CORRECT SUCH VERDICT DENIED THE PETITIOVER HIS CONSTITUTIONAL RIGHT TO DUE PROCESS,

9. BECAUSE OF THE AFOREMENTIONED SUBSTANTIAL DENIAL OF THE PETITIONER'S CONSTITUTIONAL RIGHTS, THE JUDGEMENT AND SENTENCE OF CONVICTION SHOULD BE VACATED AND SET ASIDE AND A NEW TRIAL SHOULD BE ORDERED.

## CONCLUSION

THEREFORE, FOR THE ABOVE REASONS, ROBERT A. WARREN, THE PETITIONER, RESPECTFULLY PRAYS THAT THIS HONORABLE COURT WILL VACATE THE JUDGEMENT ENTERED IN THIS CAUSE ON NOVEMBER 12, 1998, AND GRANT HIM A NEW TRIAL.

RESPECTFULLY SUBMITTED,

ROBERT A. WARREN
REG NO. B50436
MENARD CORR. CENTER
P.O. BOX 711
MENARD, ILLINOIS
62259

# APPENDIX

## LIST OF EXHIBTS

A. ORIGINAL COPY FILED OF INDICTMENT

B. TRANSCRIPT P. 76 JUDGEMENT NOV. 12, 1998

Single    Count Indictment

## IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS
## CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS   vs    ROBERT A. WARREN

Defendant,

### General Number  95 CF 1275

### INDICTMENT

THE GRAND JURY CHARGES THAT:

On or about _____ May 29, 1995 _____

_____ Robert A. Warren _____

committed the offense of _ First Degree Murder, _____

_____ Class S  Felony _____

in violation of Chapter  720 , Section ____ 5/9-1 ____  of the

Illinois Compiled Statutes, as amended, in that

said defendant, without lawful justification performed acts which
caused the death of George Robotham knowing that such acts created
a strong probability of death or great bodily harm to George
Robotham.

> JAN CARLSON
> Clerk of the Circuit Court
> Kane County, IL
>
> **JUL 1 1 1995**
>
> **FILED    OO1**
>
> ENTERED_____

All of the foregoing occurred in Kane County, Illinois.
A TRUE BILL



Foreperson of the Grand Jury

ORIGINAL        (EX. A)        CC000005

NOV. 12, 1998 "SENTENCING"

1  grief and the anguish being felt by the wife of Mr.

2  Robotham and his family and his friends.

3          The evidence that was presented during

4  this trial and this hearing I think has established

5  very clearly that the numerous problems and

6  frustrations that Robert Warren experienced during his

7  life grew within him over a period of time until he

8  became a walking time bomb, and that on May 29, 1995,

9  that time bomb exploded in a murderous rage which

10  resulted in the brutal killing of George Robotham.

11          Counsel has alluded to the problems, and I

12  think Mr. Warren has tried to deal with those problems,

13  but they obviously overwhelmed him and boiled over on

14  this fateful night in May of 1995.

15          Now, looking over first of all the

16  statutory factors in mitigation, the Court is of course

17  unable to find that the Defendant's conduct neither

18  caused nor threatened serious physical harm to another.

19  The Court is unable to find that the Defendant did not

20  contemplate that his conduct would cause or threaten

21  serious physical harm.

22          The Court is unable to find that the

23  Defendant acted under a strong provocation.

24          The Court is unable to find that there

EX. B

STATE OF ILLINOIS )
)  SS
COUNTY OF RANDOLPH )

# AFFIDAVIT

ROBERT A. WARREN, THE PETITIONER, BEING FIRST DULY SWORN, STATES THAT HE HAS READ THE FOREGOING DOCUMENT, AND THE MATTERS STATED THEREIN ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF HIS KNOWLEDGE,

_____

ROBERT A. WARREN

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____, 2000.

_____

NOTARY PUBLIC

United States District Court
Central District of Illinois

Robert A. Warren,
         Petitioner,

    V.                                    case no. _____

Stephen D. Mote, Warden,
Pontiac Correctional Center,
and the People and State of Illinois,
         Respondents.

## Notice and Proof of Service

To: United States District Court, Central District of Illinois
    100 N.E. Monroe
    Peoria, Illinois 61602

To:
    Attorney General of Illinois, Hon. Lisa Madigan
    Criminal Appeals Division
    100 W. Randolph St.    12th Floor
    Chicago, Illinois    60601

        Robert A. Warren, the Petitioner, hereby certifies that he filed an
Original and One Copy of a Pro-Se Petition for writ of Habas Corpus
with the Clerk of the Central District Court of Illinois, And that he Also
Mailed the same to the Attorney General's Office by depositing them
both in the U.S. Mail System at Pontiac Correctional Center, Pontiac Illinois,
with Postage Pre-Paid and Addressed as indicated Above.


Subscribed and Sworn to Before me
this __10__ day of __October__, 2004, A.D.


_Sharon R. Eden_
    notary Public

"OFFICIAL SEAL"
Sharon R. Eden
Notary Public, State of Illinois
My Commission Exp. 11/13/2005

Robert A. Warren
Petitioner
B50436
Pontiac Corr. Ctr.
P.O. Box 99
Pontiac, Illinois
61764